SHIRLEY E. KUB, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, RespondentKub v. CommissionerDocket No. 312-69.United States Tax CourtT.C. Memo 1974-278; 1974 Tax Ct. Memo LEXIS 43; 33 T.C.M. (CCH) 1282; T.C.M. (RIA) 740278; October 24, 1974, Filed. *43 (1) During the years 1964 through 1967, the petitioner failed to report payments received in return for promises she made to secure State contracts for another and the proceeds from the sale of items from her collection of antiques. Held, such failure to report was due to fraud on the part of the petitioner. (2) The Commissioner reconstructed the petitioner's taxable income for the years 1964 through 1967 on the bank deposits method. Held, the Commissioner's reconstruction of taxable income is sustained, except that the proceeds from the sales of antiques are treated as capital gains. (3) The petitioner failed to file a Federal income tax return for 1962. Held, the petitioner is liable for the additions to tax for failure to file a return and for negligence under secs. 6651(a) and 6653(a), I.R.C. 1954. (4) The petitioner had taxable income in 1962 including gain on the sale of a principal residence which had replaced an earlier principal residence. Held, gain computed by taking into consideration improvements on both the earlier and later residences under sec. 1034, I.R.C. 1954. (5) Held, the petitioner failed to adduce*44 proof establishing her right to an exemption for blindness under sec. 151, I.R.C. 1954. William A. Barnett, for the petitioner. Donald W. Geerhart, for the respondent. SIMPSONMEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined*46 the following deficiencies in and additions to the petitioner's Federal income taxes: YearDeficiencyAddition Under Sec. 6653(b) 11962$3,314.75$ 1,657.381963275.18137.5919641,298.28649.1419651,501.70750.8519664,553.222,276.611967473.13236.57It must be decided whether there were underpayments in Federal income taxes for the years 1964 through 1967 which were due to fraud on the part of the petitioner, and whether the Commissioner's reconstruction of income on the bank deposits method was proper. It must also be decided whether the petitioner filed a Federal income tax return for 1962; if she did not, we must determine the amount of income received by her during that year, including the amount of gain reportable by her as a result of the sale of a principal residence, and whether she is liable for the additions to tax for failure to file a return and for underpayment of tax due to negligence. The last issue which must be decided is whether the petitioner is entitled to an exemption for blindness for the years at issue. FINDINGS OF FACT*47 Some of the facts have been stipulated, and those facts are so found. The petitioner, Shirley E. Kub, had her residence at Chicago, Ill., at the time of filing her petition herein. She timely filed her Federal income tax returns for the years 1963 through 1967 with the district director of internal revenue, Chicago, Ill. On June 1, 1962, Mrs. Kub opened a personal checking account at the Harris Trust and Savings Bank (Harris), Chicago, Ill.; she maintained the account through December 31, 1967. Mrs. Kub also had a personal savings account at Harris throughout the period January 1, 1961, through September 7, 1966, when the account was closed and the balance of $26,000 used to open a new savings account at the same bank. The new savings account was maintained through the remainder of 1966 and throughout 1967. Mrs. Kub had no other bank accounts during the years 1962 through 1967. Mrs. Kub made the following total deposits in her checking account during each of the years indicated: YearAmount 1962$11,443.23196410,936.88196511,480.18196616,887.59196710,631.60Mrs. Kub withdrew the following amounts from her savings accounts and*48 deposited them in her checking account in the years indicated: YearAmount 1962$10,394.2319645,114.6019655,041.0919668,260.3919679,545.10For the years 1964 through 1967, Mrs. Kub made the following deposits in her checking account which were not the proceeds of withdrawals from her savings accounts: 1964196519661967 DateAmountDateAmountDateAmountDateAmount 1-7$ 250.002-1$ 500.001-3$ 260.009-5$ 344.502-4240.002-23300.001-7300.009-8145.002-20225.003-1400.001-10100. 009-26447.003-4250.003-564.001-17300.0010-1350.003-16250.003-31490.001-28450.0011-1550 .004-3275.004-13450.002-7175.0012-1150.004-750.005-3490.002-9146.004-14230.006-29430.00 2-14190.005-4200.007-28480.002-25475.005-18200.008-31475.002-28250.006-2240.009-2050.00 3-171,440.486-16225.009-29450.003-281,000.007-2250.0010-28480.004-740.227-15257.2811-29 480.004-29480.008-3240.0012-6400.005-650.008-14250.0012-23500.005-27490.009-1240.006- 29450.009-15240.007-670.5010-2240.007-28490.0010-16230.008-26490.0010-30400.009-29500.0012-1490.0010-27480.0012-30350.00Totals$5,822.28$6,439.00$8,627.20$1,086.50*49 Mrs. Kub made the following total deposits in her savings accounts during each of the years indicated: YearAmount 1962$53,199.611964114.121965750.0019666,003.00Such deposits do not reflect the redeposit of $26,000 from the savings account Mrs. Kub maintained prior to September 7, 1966, to the savings account she maintained thereafter. Mrs. Kub made the following deposits in her savings accounts over the years 1964 through 1967: DateAmount12-30-64$ 114.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.0012-23-65700.001-7-661,500.001-10-66503.003-28-664,000.00Mrs. Kub's savings accounts yielded the following interest income: YearAmount 1962$ 642.2619641,224.6019651,060.3119661,025.391967795.10On her Federal income tax returns for the years 1964 through 1967, Mrs. Kub reported as her only taxable income the amounts of interest received from her savings accounts during such years. Mrs. Kub did not file a Federal income tax return for the year 1962. On her 1963 return, she checked the box labeled "No" in response to the question "Did you file a return for 1962" and inserted the*50 following explanation: "Less than $600.00 income - sold house and invested proceeds." Leonard D. Charles, who had known Mrs. Kub since 1955 or 1956 when he was an inspector in the Internal Security Division of the Internal Revenue Service, prepared her 1963 return. During the course of such preparation, Mrs. Kub told Mr. Charles that she had not filed a return for 1962. At the same time, she supplied him with the information that in 1962 she had less than $600 in income and had sold her house and invested the proceeds. Mr. Charles asked Mrs. Kub whether she had any income other than the interest from the savings account at Harris, and she informed him that she had none. Mrs. Kub read the 1963 return prepared by Mr. Charles before she signed it. Mr. Charles' wife, Gloria Charles, who had known Mrs. Kub since 1958, prepared Mrs. Kub's Federal income tax returns for the years 1964 through 1967. For the years 1964 through 1966, Mrs. Kub provided Mrs. Charles with statements from Harris which indicated the amount of interest yielded by her savings accounts and told Mrs. Charles that such accounts were her only source of income. Each year, Mrs. Charles asked Mrs. Kub if she had*51 other income, and in reply, Mrs. Kub consistently replied that she did not. Mrs. Charles prepared the returns for 1964 through 1966 in Mrs. Kub's presence. In 1968, Mr. Charles secured information relevant to preparing the 1967 return from Mrs. Kub and transmitted it to Mrs. Charles, who then completed the return. When Mr. Charles asked Mrs. Kub if she had any income other than interest on her savings account in 1967, she said that she had sold some crystal. They discussed whether or not the proceeds should be reported; it was decided not to include such proceeds on the 1967 return. On September 27, 1968, Charles B. Coe, the IRS agent who was examining Mrs. Kub's returns for the years 1962 through 1967, met with James F. Ashenden, Jr., who had been Mrs. Kub's attorney since the early 1950's. The meeting was held at Mr. Ashenden's office, and Mrs. Kub was present during the first part of the meeting. Mr. Ashenden was requested to explain the sources of Mrs. Kub's bank deposits over the years 1962 through 1967. Mr. Ashenden mentioned three potential sources: (1) A $4,900 inheritance from Mrs. Kub's aunt, Agnes Devine, (2) a $6,000 gift from Mark Devine, husband of Agnes Devine, *52 and (3) $250 a month from Mrs. Kub's boarder, James Hetterman. Agnes Devine died in 1956, and Mr. Devine died at least a year and a half prior to her death. Mrs. Kub deposited any inheritance received from Mrs. Devine's estate in her bank accounts. James Hetterman boarded with Mrs. Kub from 1945 to 1963, when he died. During such period, he paid Mrs. Kub sums for room and board and other expenses. Mr. Coe was not advised by either Mrs. Kub or Mr. Ashenden that a long-time friend of Mrs. Kub, Pearl Ann Reeder, had made advances or loans to Mrs. Kub. During the years 1964 through 1967, Miss Reeder loaned Mrs. Kub varying sums of money, on the average of about once a week. Miss Reeder did not keep a written record of the loans and considered that she and Mrs. Kub had a "gentlemen's agreement" concerning repayment, but no repayment of them has been made. Mrs. Kub told Miss Reeder that she needed the money to enhance her collection of antiques. Miss Reeder did not consider herself a wealthy woman; her salary was about $300 per week in 1964, and she had a small farm in Indiana. However, she also felt that art pieces and antiques meant a good deal more than money. Miss Reeder*53 loaned Mrs. Kub such amounts as she could afford. Miss Reeder estimated that over the 4 years, the borrowings totaled from $14,000 to $17,000. She also estimated that during 1964 through 1967, 70 to 80 percent of the proceeds of all her checks drawn to cash in the amount of $50 or more was loaned to Mrs. Kub. Miss Reeder retained the following checks for $50 or more which were drawn to cash during the years 1964 through 1967: DateAmountDateAmountDateAmountDateAmount 1964196419641966 1-4$3157-1$ 6012-3$ 503-24$ 501-9507-316512-10501-16507-65012-17754-1751-23507-105012-211004-7501-305 07-165012-231004-14507-245012-31754-21652-32757-30504-28602-6502-13508-65019655-5502-20508-14655-12752-27508-20501-2$ 655-14508-27501-7505-19503-5501-13505-26603-12509-2 751-13503-19509-9501-19506-2603-26509-17501-21506-4509-24501-23506-950 4-2506-16504-236210-1504-1506-23504-95010-8504-1904-165010-15504-850 7-28504-235010-23504-15504-275010-24504-22658-4504-305010-27508-115010- 29508-18505-51208-25605-75011-5505-95011-95010-27505-145011-12755 -215011-195011-2605-285011-215011-96011-245011-15706-415511-275011-16606-55011-24606-18506-2550*54 For months for which checks were not kept or were only partially retained, Miss Reeder maintained her practice of lending money to Mrs. Kub. Based on Miss Reeder's practice for months for which checks were kept, Miss Reeder cashed, on an average, approximately $310 worth of checks for over $50 each month. Robert V. Mehaffey operated a consulting engineering business in Chicago, Ill., for at least 20 years prior to his death on September 25, 1968. He conducted the business as a sole proprietorship until sometime in 1966, when he incorporated the business under the name of Robert V. Mehaffey Associated Engineers, Inc. From 1948 until approximately February 1964, Mr. Mehaffey received no public contract awards directly from the State of Illinois, although he occasionally received subcontracts from architects for engineering work on State jobs in Illinois and other States. Mr. Mehaffey first met Mrs. Kub sometime in the early 1940's. Their acquaintance lapsed until early 1964, when she contacted him, and during the years 1964 through 1966, they had frequent telephone conversations and often met at her apartment. During one of their early meetings in 1964, Mrs. Kub told him*55 that she could obtain State work for him from the Illinois Department of Public Works and Buildings. In 1964, during three meetings in Mr. Ashenden's office and in Mr. Ashenden's presence, Mrs. Kub explained to Mr. Mehaffey that after getting the State contracts, he would have to make certain payments to her and Mr. Ashenden. Mr. Mehaffey agreed to the arrangement, but no precise figure was set during the three meetings. Commencing in February 1964, Mr. Mehaffey made payments of $500 per month each to Mr. Ashenden's law firm and to Mrs. Kub. The payments to the law firm were by check, but with few exceptions, the payments to Mrs. Kub were in cash, at her request. Mr. Mehaffey's monthly payments to the law firm continued until August 1964, when Mrs. Kub instructed him to discontinue the payments to the law firm but to continue paying her. Shortly thereafter, Mrs. Kub requested that he double her payments. He and Mrs. Kub had a discussion concerning the particulars of the payments, and he offered to pay her 10 percent of the fees he earned if she would accept payment by check. However, since she refused to accept payment by check, he agreed to pay her only 5 percent of his*56 fees. The payments continued until October 1966; after an argument in December 1966, Mr. Mehaffey and Mrs. Kub had no further contact. From February 1964 to October 1966, Mr. Mehaffey paid Mrs. Kub a total of $24,300 under their arrangement. Mr. Mehaffey obtained several contracts with the Illinois Department of Public Works and Buildings over the years 1964 through 1966, including contracts for engineering services at the Galesburg State Research Hospital dated 11-18-65, for engineering services at the Manteno State Hospital dated 1-3-66, and for engineering services at the Vienna branch of the Illinois Penitentiary. After December 1966, Mr. Mehaffey received no further contracts from the State of Illinois. On August 14, 1968, at his office, Mr. Mehaffey met with Mr. Coe and Thomas F. Howard, an inspector of the IRS (the IRS agents), and recounted to them the circumstances concerning his payments to Mrs. Kub over the years 1964 through 1966. A record of the meeting was kept and transcribed the same day by Mr. Howard. They were not investigating Mr. Mehaffey's Federal income tax liability; the interview was prompted by their investigations of Mrs. Kub and Mr. Charles.At a*57 prior meeting, Mr. Coe had told Mr. Mehaffey that he was being interviewed in the course of Mr. Coe's investigation of Mrs. Kub. During the August 14, 1968, meeting, Mr. Mehaffey said that in the fall of 1966, he had been anxious to get rid of the State work, chiefly because of Mrs. Kub's behavior. Once he started getting the contracts, Mrs. Kub "never stopped bothering him" as she persistently requested greater amounts of money than she had been receiving and was argumentative about what was owed her by Mr. Mehaffey. Because he was fed up with Mrs. Kub by December 1966, he was glad to be rid of her when they had their final argument. He stated that he had never brought any pieces from Mrs. Kub's collection of antiques since "he would be afraid the item would be either broken or overpriced." During the meeting, Mr. Mehaffey furnished the IRS agents a ledger sheet (Illinois State jobs sheet) which recorded the payments he had made to Mrs. Kub and Mr. Ashenden's law firm over the years 1964 through 1966. Lila Lennon had worked with Mr. Mehaffey for 20 years prior to 1968 and was the secretary of the corporation after the business was incorporated. During the years 1964 through*58 1966, she handled the business correspondence, kept the books, paid the bills, signed the checks, worked on the contracts, and billed clients. She prepared the business records and made all the entries therein, including the Illinois State jobs sheet. Mr. Mehaffey instructed her to maintain a separate accounting record of such payments. Each entry was made on the basis of information transmitted to her by Mr. Mehaffey and was entered the same day the check for the particular payment was drawn. Mr. Mehaffey utilized the information contained in the record in the conduct of his business. The record was maintained and used by him to ascertain the costs and profitability of his State jobs. The Illinois State jobs sheet contained two columns of figures, one headed by the name of Mr. Ashenden's law firm and the other by the name "Shirley Kub." In the column under the law firm, there are notations of 7 monthly payments of $500, covering the period February 1964 through August 1964. In the column under Mrs. Kub's name, notations were made with respect to certain of Mr. Mehaffey's business checks, including the number of the checks, the amount, and the month and year of payment. The*59 Illinois State jobs sheet revealed that the following amounts were paid to Mrs. Kub: NumberDatePayeeAmount toNotationsMrs. Kubon Check38262-19-64Robert V. Mehaffey$ 25038473-2-64Robert V. Mehaffey25038663-13-64Currency25039014-2-64Robert V. Mehaffey25039214-13-64Robert V. Mehaffey250Endorsed byMrs. Kub39525-1-64Robert V. Mehaffey25039795-15-64Robert V. Mehaffey25040016-1-64Robert V. Mehaffey25040356-15-64Robert V. Mehaffey250Endorsed byMrs. Kub40747-1-64Robert V. Mehaffey250Endorsed byMrs. Kub40927-14-64Robert V. Mehaffey25041377-30-64Robert V. Mehaffey25041658-12-64Robert V. Mehaffey250Endorsed byMrs. Kub42159-1-64Currency25042269-14-64Currency250429710-30-64Robert V. Mehaffey500436411-30-64Currency500445512-29-64Robert V. Mehaffey50045391-29-65Currency50046122-26-65Robert V. Mehaffey50046813-31-65Currency50047294-13-65Currency500Endorsed byMrs. Kub48515-26-65Robert V. Mehaffey50049506-28-65Robert V. Mehaffey50050347-28-65Currency5005112 28-31-65"Five Hundred &50000 /xx"51769-28-65Robert V. Mehaffey500526710-27-65Robert V. Mehaffey500532811-26-65Robert V. Mehaffey500535212-2-65Robert V. Mehaffey400"SK/Galesburg"540712-20-65Robert V. Mehaffey1,000"SK-Manteno"541512-22-65Robert V. Mehaffey1,000"SK-Manteno"542512-28-65Robert V. Mehaffey1,000"SK-Manteno"5452 21-7-66Robert V. Mehaffey$ 700"SK-Manteno"54531-7-66Robert V. Mehaffey300"SK-Loan"54951-27-66Robert V. Mehaffey500"SK-A/C"55692-24-66Robert V. Mehaffey500"SK-A/C"55792-26-66Currency250"SK-Vienna"55953-16-66Robert V. Mehaffey4,000"SK-Vienna"1383-16-66Robert V. Mehaffey90056043-30-66Robert V. Mehaffey500"A/C-SK"56174-22-66Currency50056315-27-66Currency500"SK-A/C"56426-17-66Currency50056557-22-66Currency500569010-26-66Robert V. Mehaffey500NumberNotations on Illinois State Job Sheet3826384738663901392139523979400140354074409241371654215422642974364445545394612468147294851495050345112 25176526753285352For Galesburg5407For Manteno5415For Manteno5425For Manteno5452 2For Manteno5453A/C (Loan) Vienna5495A/C Vienna5569A/C Vienna5579A/C Vienna5595Vienna138Vienna5604A/C5617A/C5631A/C5642A/C5655A/C5690A/C*60 The checks were drawn by either Mrs. Lennon or Mr. Mehaffey. When Mrs. Lennon drew the checks, she did so on Mr. Mehaffey's instructions. The notations on the checks were made by Mr. Mehaffey and Mrs. Lennon; in most cases, Mrs. Lennon made the notation by typewriter. The notations "SK-Manteno" or "SK-Vienna" on checks numbered 5425, 5452, and 5595 signified that the amounts payable were to be applied to Mrs. Kub's payments for the Manteno or Vienna jobs. The notations "SK-A/C," "A/C-SK," or "SK-Loan" on checks numbered 5495, 5569, 5604, and 5453 meant that the amounts payable were to be applied to Mrs. Kub's account until it could be determined to which job they should be assigned. Mrs. Lennon also maintained a cash receipts and disbursements ledger book wherein she recorded the income and expenses of the business for the years 1964 through 1966. The payments to Mr. Ashenden's law firm were entered under the heading of professional fees. The checks listed under Mrs. Kub's name on the Illinois State jobs sheet were recorded in the ledger book as*61 checks drawn to "RVM" and were posted to Mr. Mehaffey's personal account. Early in 1964, Mrs. Lennon sought advice from the accountant who prepared Mr. Mehaffey's tax return concerning whether the cash payments to Mrs. Kub could be properly posted to an expense account; she was advised that such payments should be posted to Mr. Mehaffey's personal account. On one occasion, a check listed on the Illinois State jobs sheet under Mrs. Kub's name was not posted to Mr. Mehaffey's personal account in the ledger book. That check, number 4092, drawn July 14, 1964, was listed as issued to "RVM," but it was noted that the proceeds were used for office expenses, personal expenditures, entertainment, gifts, travel, and car fare. The ledger book and the Illinois State jobs sheet were kept in the same file cabinet along with the rest of the business records and check books. Mrs. Kub owned an extensive collection of antiques, crystal, glassware, china, silver, and similar items during the years 1962 through 1967. Paintings and Boehm Birds were also included in the collection. The collection filled many of Mrs. Kub's cabinets and display cases; her various residences were filled by her collection.*62 Mrs. Kub had received most of her collection from her family. Her collection remained generally unchanged for over the years 1962 through 1967. During those years, she made occasional sales of particular items from the collection. During the years 1965 through 1967, Mrs. Kub made several sales to Mrs. Emma Hull, who at that time, ran the Hull Haviland Shop, an antique store. Mrs. Hull considered Mrs. Kub a collector as opposed to a dealer in antiques and similar items. Mrs. Hull's purchases from Mrs. Kub consisted primarily of crystal, but a few items of furniture were included. The purchases from Mrs. Kub included: in January 1965, $210.50 for glassware and crystal; on January 17, 1966, $571.50 for glassware, crystal, and furniture; and on January 20, 1966, $146.00 for glassware and crystal. The payments by Mrs. Hull for items purchased from Mrs. Kub included the following: dateamount 1-10-66$ 373.002-5-66171.002-8-66146.002-11-66199.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.503-16-66246.009-5-67344.509-8-67145.009-22-67447.00Miss Reeder was the editor of Hobbies Magazine, which is a magazine for collectors of various items, including antiques.*63 Her association with the magazine began when it was founded in 1931. Miss Reeder had a personal box number in the magazine's advertising section which Mrs. Kub used twice in attempting to sell some articles from her collection. Miss Reeder often visited Mrs. Kub's residence and was familiar with her collection. Miss Reeder considered Mrs. Kub a collector rather than a dealer. Mrs. Kub also did business with a firm of auctioneers. On July 15, 1955, Mrs. Kub purchased a house and adjoining land in Park Ridge, Ill. (Park Ridge property), for $29,500.00. She paid $123.45 in legal fees in connection with the purchase of the house and land. During the years she owned the Park Ridge property, she spent $2,875.00 for improvements on the property. Mrs. Kub sold the Park Ridge property on September 1, 1959, for $62,500.00. On November 3, 1959, Mrs. Kub purchased a house and adjoining land in Barrington, Ill. (Barrington property), for $38,250.00. She incurred costs of $15,032.44 in improving the house, driveway, and land. On May 11, 1962, she sold the property for a net sales price of $54,218.70, of which she deposited $52,199.61 in her savings account at Harris. Mrs. Kub had a*64 gain of $21,844.70 from the sale of the Barrington property. After the sale of that property, she moved to Chicago, Ill., where she resided in an apartment rented by her. On April 13, 1964, Mrs. Kub met with Mr. Charles for the purpose of securing his assistance in preparing her 1963 Federal income tax return. The meeting took place in a drugstore in downtown Chicago, which was approximately 2 miles away from Mrs. Kub's residence. She arrived at the meeting alone and unassisted. She and Mr. Charles met in the same drugstore in early 1968 in connection with the preparation of her 1967 return. Mr. Charles noticed that Mrs. Kub was able to navigate the streets without assistance and did not see anyone aid her on the occasions of their meetings. During 1968, Mrs. Kub had meetings with John M. Walsh, an IRS special agent, on the average of once a week. These meetings took place in restaurants, a bus depot, and other places in downtown Chicago. Mrs. Kub always went to such meetings alone by means of public transportation. Mrs. Kub had attained 70 years of age prior to 1962; her driver's license expired around April 1968, and by then, she considered herself too old to obtain*65 another. Over the years 1962 through 1967, Mrs. Kub complained about her failing eyesight; she has been suffering from glaucoma since 1956. She did not claim an exemption for blindness on any of her Federal income tax returns for the years 1963 through 1967. In his notice of deficiency, the Commissioner determined that there had been under-reporting of income for all the years 1962 through 1967, that all or part of the underpayments in Federal income taxes for such years was due to fraud, that Mrs. Kub had capital gains on the sale of the Barrington property in 1962, and that Mrs. Kub failed to file a Federal income tax return for the year 1962. He also imposed a self-employment tax on Mrs. Kub's unreported income for the years 1962 through 1967. In his answer, the Commissioner alleged that Mrs. Kub omitted from the gross income stated on her returns for the years 1963 and 1964 an amount more than 25 percent of the amount reported. In his second amended answer, the Commissioner alleged, in the alternative, that Mrs. Kub's failure to file a return for the year 1962 was due to willful neglect and that all or part of the underpayment of tax for 1962 was due to negligence or intentional*66 disregard of rules and regulations. In her petition, Mrs. Kub alleged that she was entitled to an additional exemption for blindness for the years 1962 through 1967. In his brief, the Commissioner conceded that no part of the underpayments of tax for 1962 and 1963 was due to fraud and that there was not an omission for 25 percent or more of gross income on the 1963 return. OPINION 1. Fraud For The Years 1964 Through 1967 The main issue to be decided in this case is whether there were underpayments of Federal income taxes for the years 1964 through 1967 which were due to fraud. Sec. 6653(b). Unless fraud or an omission of gross income in excess of 25 percent of the amount reported is shown, the statute of limitations bars assessment and collection of deficiencies for the year 1964. Sec. 6501(c) and (e) (1) (A). The Commissioner argued that Mrs. Kub's failure to report Mr. Mehaffey's payments to her during the years 1964 through 1966 constituted fraud. It is his position that such amounts were received in return for her promises to secure State work for Mr. Mehaffey, that as such, they were properly includable in taxable income, and that her failure to so include them*67 was intentional. On the other hand, Mrs. Kub argued that any facts tending to show she received such payments are based on hearsay or irrelevant evidence and thus concluded that since any evidence concerning her business arrangement with Mr. Mehaffey is inadmissible, the Commissioner failed to produce evidence sufficient to sustain his burden of proving fraud. Thomas B. Jones, 29 T.C. 601 (1957). Under section 7453, trials before the Tax Court are to be conducted "in accordance with the rules of evidence applicable in trials without a jury in the United States District Court of the District of Columbia"; such rules include the Federal Rules of Civil Procedure (FRCP). Rule 143, Tax Court Rules of Practice and Procedure; 3Hicks Co., 56 T.C. 982 (1971), affd. 470 F.2d 87 (C.A. 1, 1972). Rule 43(a), FRCP, provides: *68 (a) Form and Admissibility. In all trials the testimony of witnesses shall be taken orally in open court, unless otherwise provided by these rules. All evidence shall be admitted which is admissible under the statutes of the United States, or under the rules of evidence heretofore applied in the courts of the United States on the hearing of suits in equity, or under the rules of evidence applied in the courts of general jurisdiction of the state in which the United States court is held. In any case, the statute or rule which favors the reception of the evidence governs * * * The rule "is a rule of admissibility, not a rule of exclusion" and should not be construed to unduly exclude trustworthy evidence. Hicks Co., 56 T.C. at 1015. Its language is "not an invitation to license" but the rule favors the admission and utilization of relevant and reliable evidence. M.S. Walker, Inc. v. Travelers Indemnity Co., 470 F.2d 951, 953 (C.A. 1, 1973). The Commissioner proffered the statement made by Mr. Mehaffey to the IRS agents as evidence of the fact that Mr. Mehaffey*69 made payments to Mrs. Kub in return for her promises to secure him State contracts. Clearly, Mr. Mehaffey's statement is relevant to the present inquiry, since it provides facts which tend to support the conclusion that Mrs. Kub did receive the payments. Rule 401, Proposed Federal Rules of Evidence (Evidence Rules); United States v. Pugliese, 153 F.2d 497 (C.A. 2, 1945); McCormick, Evidence, sec. 185 (2d ed. 1972) (McCormick). However, the statement appears to be hearsay since it is a statement made out of court which is submitted as evidence of the truth of the matters set forth therein. Evidence Rule 801; McCormick, sec. 246. The hearsay rule operates to exclude evidence too untrustworthy to be used in the fact-finding process. McCormick, sec. 245. However, Mr. Mehaffey's statement has several guarantees of credibility and accuracy. Koninklijke Luchtvaart Maatschappij N.V. KLM v. Tuller, 292 F.2d 775 (C.A.D.C. 1961); People v. Lettrich, 413 Ill. 172, 108 N.E. 2d 488 (1952). In the first place, the statement outlined a series of transactions which Mr. Mehaffey had taken precautions to conceal, indicating that he was aware of the*70 impropriety of such transactions. Filesi v. United States, 352 F.2d 339 (C.A. 4, 1965); Nuttall v. Reading Co., 235 F.2d 546 (C.A. 3, 1956); Carson v. Squirrel Inn Corp., 298 F. Supp. 1040 (D.S.C. 1969). Mr. Mehaffey maintained a separate accounting record of his payments to Mrs. Kub on the Illinois State jobs sheet; at her request, the payments to Mrs. Kub were made in cash; and on the advice of his accountant, Mr. Mehaffey did not treat the payments as business expenses on his business records, although they were expenses incurred in the course of obtaining work with the State. The fact that Mr. Mehaffey revealed to the IRS agents the occurrence of these transactions, even though he obviously recognized their impropriety, constitutes a significant reason for believing his statement. Both the manner of making the statement and the detail contained therein are circumstances adding to the credibility of Mr. Mehaffey's statement. His allegations concerning the arrangement with Mrs. Kub were made in the course of an investigation by the IRS agents; they were not made in an offhand manner or in the course of a casual conversation. The importance*71 of the investigation would cause him to concentrate his attention on his attempt to recall and recount his dealings with Mrs. Kub. Oscar Gruss & Son v. Lumbermen's Mutual Casualty Co., 422 F.2d 1278 (C.A. 2, 1970); Gichner v. Antonio Troiano Tile & Marble Co., 410 F.2d 238 (C.A.D.C. 1969); compare Filesi v. United States, supra.The statement contained sufficient detail to indicate that it was not a recent fabrication. The statement included a full and specific explanation of how he and Mrs. Kub entered into their arrangement, how the arrangement was carried on, and how it terminated. It included many details about dates and places, to some of which Mrs. Kub also testified. In addition, it recounts a great deal of information peripheral to the arrangement he had with Mrs. Kub which tends to show that the statement was not a product of afterthought, but had its source in the actual events recounted therein. Paul Damski, 29 T.C. 1 (1957). Mr. Mehaffey's allegations concerning the payments and his receipt of State contracts were corroborated by independent documentary evidence. Mr. Mehaffey drew or had drawn a series of the*72 business' checks to currency or to himself, generally in the amount of $250 or $500, over the period February 1964 through October 1966. Five of the checks drawn in 1964 and 1965 bore Mrs. Kub's endorsement; seven of the checks drawn in 1965 and 1966 bore notations indicating to which State job a payment to Mrs. Kub was applicable; and five of the checks drawn in 1966 bore notations indicating they were payable to Mrs. Kub's account. Mr. Mehaffey had not directly received any State contracts prior to March 1964 and, after the payments to Mrs. Kub ceased, did not again receive another such contract. The business ledger book reflects payments of $500 each month to Mr. Ashenden's law firm from February 1964 through August 1964 and payments to "RVM" from February 1964 through October 1966. The Illinois State jobs sheet also reflects such payments and indicates that the checks entered to "RVM" in the ledger book were payments to Mrs. Kub. The various notations on the Illinois State jobs sheet alongside particular checks - "For Galesburg," "For Manteno," "A/C Vienna," "Vienna," and "A/C" - also tie such checks into the various State projects on which he worked. Such corroboration by*73 independent documentary evidence is very cogent support for the statement's reliability. Chambers v. Mississippi, 410 U.S. 284 (1973); compare United States v. Walling, 486 F.2d 229 (C.A. 9, 1973); United States v. Sheard, 473 F.2d 139 (C.A.D.C. 1972), cert. denied 412 U.S. 943 (1973); United States v. Alexander, 430 F.2d 904 (C.A.D.C. 1970); Deike v. Great Atlantic & Pacific Tea Co., 3 Ariz. App. 430, 415 P.2d 145 (1966). The Commissioner argued that the circumstances of the making of the statement and the facts elucidated therein bring it within the declaration against interest exception to the hearsay rule and that it is therefore admissible into evidence. Four conditions must be met before a hearsay statement is admissible as a declaration against interest: (1) The declarant must be unavailable at trial, (2) the declarant must have personal knowledge of the facts stated, (3) the declarant must have no motive which would induce him to misrepresent the facts stated, and (4) the statement must have been*74 against the declarant's interest when made. McCormick, sec. 253, pp. 670-679. The petitioner conceded that the first and second requirements are satisfied but maintained that Mr. Mehaffey's personal animosity toward Mrs. Kub undermines the reliability of the statement to such an extent as to render it inadmissible, and that the statement was only a declaration against his penal interest, which interest is not encompassed by the exception. In our judgment, Mr. Mehaffey's statement was not motivated by bias or hostility toward Mrs. Kub. He received no benefit from making the statement and, in making it, was not protecting himself from potential criminal or tax sanctions. Cf. United States v. Sheard, supra; United States v. Alexander, supra; Deike v. Great Atlantic & Pacific Tea Co., supra. It is true that Mr. Mehaffey was glad to get "rid of" Mrs. Kub as he was "fed up" with her by the end of 1966, and that he was afraid that if he did buy an item from her collection of antiques, he would not get what he paid for. Yet, those feelings do not explain away his statement. Such feelings would not have caused him to make a statement contrary*75 to her own interests, would not have enabled him to provide the detail contained in the statement, and would not have enabled him to manufacture all the independent corroborative documentary evidence. Nor are we convinced by the petitioner's other objection. In revealing his arrangement with Mrs. Kub, Mr. Mehaffey exposed himself to both civil and criminal liability. Under the Illinois statutes, there was the possibility that the State contracts obtained by him might be set aside, and he might be required to return part or all of the compensation received by him for his services. Ill. Ann. Stat. ch. 102, sec. 3 (Smith-Hurd 1974). There was also the possibility that his payment of commissions to Mrs. Kub might subject him to criminal prosecution. Ill. Ann. Stat. ch. 38, sec. 33-1(c) (Smith-Hurd 1970). Whether he was actually aware of those statutes, we do not know, but in determining whether his statement was contrary to his interest, we apply the objective test of whether a reasonable man would have believed his statement to be contrary to his proprietary or penal interest. Evidence Rule 804(b) (4); Jefferson, "Declarations Against Interest: An Exception to the Hearsay Rule,*76 " 58 Harv. L. Rev. 1 (1944); see also United States v. Matlock, 415 U.S. 164 (1974); Filesi v. United States, 352 F.2d 339 (C.A. 4, 1965); Carson v. Squirrel Inn Corp., 298 F. Supp. 1040 (D.S.C. 1969). The facts that the record of the payment of the commissions to Mrs. Kub was kept separate from the other business records, that the payments to her were made in cash, and that such payments were not treated as business expenses - all make it abundantly clear that Mr. Mehaffey was aware that the arrangement was improper. He was an experienced engineer and businessman, and as such, he must have recognized the possibility that obtaining State contracts through the arrangement with Mrs. Kub might lead to his involvement in criminal charges and demands for repayment of the fees received by him. According to the traditional view, a hearsay statement is admissible when it is contrary to the proprietary and pecuniary interest of the declarant. Donnelly v. United States, 228 U.S. 243 (1913); United States v. Walling, supra.*77 In our judgment, Mr. Mehaffey, as a reasonable man, must have recognized that his statement was contrary to his proprietary and pecuniary interest, and for that reason, such statement is admissible. Moreover, in Illinois, it has been held that a statement contrary to the declarant's penal interest is also admissible. People v. Lettrich, 413 Ill. 172, 108 N.E. 2d 488 (1952). Since the trial of this case took place in Illinois, Rule 43(a), FRCP, requires us to consider that holding, and since that holding favors the admission of Mr. Mehaffey's statement, it is another reason for admitting it in this case. In Donnelly v. United States, supra, it was held that a hearsay statement was not admissible even though it was contrary to the penal interest of the declarant. However, we are satisfied that such holding is no bar to the admission of Mr. Mehaffey's statement in this case. At that time, Justice Holmes dissented (228 U.S. at 277) and pointed out that there is no sound reason for refusing to admit a statement contrary to the penal interest of the declarant. If the statement will subject the declarant to criminal liability, that risk is as*78 much an indication of credibility as the risk of civil liability might be. In many instances, the criminal consequences could be much more severe than the damage to the declarant's proprietary interest, and if he makes the statement despite the risk of criminal sanctions, there is good reason to accept the reliability of the statement. In addition, the holding of Donnelly has been undermined in recent years. The Supreme Court has limited such holding and refused to apply it in several recent cases. United States v. Matlock, supra; Chambers v. Mississippi, 410 U.S. 284 (1973); United States v. Harris, 403 U.S. 573 (1971). In Matlock, the Court held that statements admitting cohabitation out of wedlock, a crime in the declarant's State of residence, were admissible in certain pre-trial proceedings to show that the declarant had sufficient interest in certain premises to authorize a search of the premises. The Court held in Chambers that the defendant in a murder prosecution was denied due process of law because, in part, he was not allowed to present witnesses who would have testified that another admitted culpability for the crime. Probable*79 cause to search premises for illicit liquor was predicated in part upon the declarant's statements that he had purchased such illicit liquor at the searched premises in Harris. In certain civil cases, Federal courts have simply ignored the Donnelly decision and allowed the admission of a hearsay statement because, in part, such statement was contrary to the penal interest of the declarant. Trade Development Bank v. Continental Insurance Co., 469 F.2d 35 (C.A. 2, 1972); Koninklijke Luchtvaart Maatschappij N.V. KLM v. Tuller, 292 F.2d 775 (C.A.D.C. 1961); see Carson v. Squirrel Inn Corp., supra.In M.S. Walker, Inc. v. Travelers Indemnity Co., 470 F.2d 951 (C.A. 1, 1973), the Donnelly holding was discussed and the court specifically declined to apply it in reaching a decision. The applicability of Donnelly to criminal proceedings in Federal courts has also been questioned. United States v. Seyfried, 435 F.2d 696 (C.A. 7, 1970); United States v. Dovico, 380 F.2d 325 (C.A. 2, 1967), cert. denied 389 U.S. 944 (1967); but see United States v. Walling, 486 F.2d 229 (C.A. 9, *80 1973). Many States have also decided to allow the admission of such hearsay statements in both civil and criminal cases. See, e.g., People v. Brown, 26 N.Y. 2d 88, 257 N.E. 2d 16, 308 N.Y.S. 2d 825 (1970); Deike v. Great Atlantic & Pacific Tea Co., 3 Ariz. App. 430, 415 P.2d 145 (1966); People v. Spriggs, 60 Cal. 2d 868, 389 P.2d 377, 36 Cal. Reptr. 841 (1964); Sutter v. Easterly, 189 S.W. 2d 284 (Mo. 1945). Finally, Evidence Rule 804(b) provides in part: (b) Hearsay exceptions. The following are not excluded by the hearsay rule if the declarant is unavailable as a witness: * * * (4) Statement against interest. A statement which was at the time of its making so far contrary to the declarant's pecuniary or proprietary interest, or so far tended to subject him to * * * criminal liability * * * that a reasonable man in his position would not have made the statement unless he believed it to be true. * * * That rule was approved by the Supreme Court and transmitted to the Congress for its consideration. Although the Congress is*81 considering some changes in the rule, those changes do not relate to the quoted part and do not affect the issue in this case. H. Rept. No. 93-650, 93d Cong., 1st Sess., p. 16 (1973). Thus, it appears that at the present time, both the Supreme Court and the Congress are agreed that hearsay statements contrary to the declarant's penal interest should be admitted. In view of these developments, it is clear to us that the Donnelly holding should not now be applied to exclude a statement which is contrary to the penal interest of the declarant from the evidence considered in a civil case, and accordingly, we hold that Mr. Mehaffey's statement is admissible. The admission of such statement removes the petitioner's only objection to the admission of the Illinois State jobs sheet and the other business records of Mr. Mehaffey. The petitioner contended that based solely on the information contained therein, such records were not relevant. However, with Mr. Mehaffey's statement before us, there can be no doubt as to the relevancy of such records, and we hold them to be admissible. Mrs. Lennon's testimony at trial is also relevant and admissible. She testified that the records chronicled*82 payments which were made to Mrs. Kub in return for State contracts. The petitioner has objected to the admissibility of such testimony claiming that it was a hearsay account of what Mr. Mehaffey said to Mrs. Lennon concerning his arrangement with Mrs. Kub. However, Mr. Mehaffey's statements to Mrs. Lennon appear to be declarations against his interest and thereby admissible under that exception to the hearsay rule. Mr. Mehaffey was unavailable to testify, and the facts he recounted to Mrs. Lennon were within his personal knowledge. There appears to have been no motive for him to misrepresent the facts to Mrs. Lennon, and in fact, Mrs. Lennon's position in the business and the length of their association together indicates that their business relationship was probably such that Mr. Mehaffey was willing to trust Mrs. Lennon with information detrimental to his interests. The records, checks, and contracts bear out her testimony in the same fashion as they did with Mr. Mehaffey's statement to the IRS agents. The information Mr. Mehaffey imparted to Mrs. Lennon concerned the same series of transactions as he recounted in that statement. Mrs. Lennon's testimony about Mr. Mehaffey's*83 assertions concerning Mrs. Kub is thus admissible as a declaration against interest for the same reasons as is Mr. Mehaffey's statement to the IRS agents. Mr. Mehaffey's statement, Mrs. Lennon's testimony, the checks, the business records, and the State contracts constitute convincing evidence that Mr. Mehaffey made payments to Mrs. Kub from 1964 through 1966 in return for her promise to secure him State work. Each such item of evidence corroborates and supplements the others. In his statement, Mr. Mehaffey said that he made monthly payments of $500 to Mrs. Kub over the period February 1964 through October 1966; the Illinois State jobs sheet lists such payments under Mrs. Kub's name and indicates that they were made on a monthly basis from February 1964 until the end of 1965, when the payments listed started to be in varying amounts. The payments claimed to have been made to the Ashenden law firm - $500 monthly from February to August 1964 - were also reflected on the Illinois State jobs sheet. The checks whose proceeds were claimed to have been paid to Mrs. Kub were all either made out to "Currency" or "Robert V. Mehaffey," bearing out his contention that most of such payments*84 were made to Mrs. Kub in cash. Five of the checks bear Mrs. Kub's endorsement. Mr. Mehaffey's allegation that he had received State contracts is supported by the fact that he did receive some over the 3-year period. His assertion that the checks were in return for Mrs. Kub's promises to secure him State work is also borne out by the notations on the checks and on the Illinois State jobs sheet that certain checks related to particular contracts and to Mrs. Kub's activities. Mrs. Kub testified that she was acquainted with Mr. Mehaffey, met frequently with him during the years 1964 through 1966, but specifically denied that she had ever promised Mr. Mehaffey that she would secure him State contracts and denied that she ever received payments from him in return for such promises. She also stated that in 1966 and 1967, she had received several checks, in the total amount of $1,500, from him as payment for his purchase from her of Masonic pins, a wood cabinet, a French bronze bust of Lincoln, etchings of Lincoln, and some crystal stemware. However, for several reasons, we found her testimony unconvincing. Contradicted testimony of an interested witness need not be accepted as*85 credible evidence. Luerana Pigman, 31 T.C. 356 (1958). Mr. Mehaffey's statement was a detailed account of various events that spanned a period of time and those events were reflected in the business records. On the contrary, Mrs. Kub's statement was general and lacked detail, and she offered no documentary support or other corroborative evidence. Under the circumstances, Mr. Mehaffey's statement is far more persuasive. Wood County Telephone Co., 51 T.C. 72 (1968); Domestic Management Bureau, Inc., 38 B.T.A. 640 (1938). In addition, a comparison of Mr. Mehaffey's records, showing the times when payments were made to Mrs. Kub and the amount of such payments, with the bank records of Mrs. Kub reveals an irrefutable correlation between the times of payments and her deposits. The correlation is so close that it cannot be explained by chance; it establishes that beyond any doubt Mrs. Kub received the payments which Mr. Mehaffey claimed to have made to her. Mrs. Kub's attempt to explain her deposits by claiming they represented loans from Miss Reeder is not convincing. A comparison of Mrs. Kub's deposits with the information concerning such loans*86 shows clearly that those deposits could not have come from such loans. Most of the deposits coincide with the payments received from Mr. Mehaffey, but there is no correlation between the deposits and the loans from Miss Reeder. Analysis of the documentary evidence also reveals that she received from Mr. Mehaffey many more checks than the five which she admitted receiving, and therefore, belies her testimony that she only received five checks from Mr. Mehaffey in payment for items which she sold to him. Also, the checks endorsed by her were received prior to the times when she claimed to have made the sales to Mr. Mehaffey. Our conclusion is supported by the petitioner's failure to call Mr. Ashenden as a witness to refute Mr. Mehaffey's statements with respect to the three meetings in early 1964, in Mr. Ashenden's presence, during which the initial arrangements were made. Failure to call a potential witness who is available and possesses knowledge about the facts of a case, and whose relationship with a party inclines him to favor such party, raises an inference that the absent witness' *87 testimony would not have been favorable to such party. Jacob S. Kamborian, 56 T.C. 847 (1971), affd. 469 F.2d 219 (C.A. 1, 1972); Samuel Pollack, 47 T.C. 92 (1966), affd. 392 F.2d 409 (C.A. 5, 1968); Wichita Terminal Elevator Co., 6 T.C. 1158 (1946), affd. 162 F.2d 513 (C.A. 10, 1947). Mr. Ashenden was physically present in the same city where the trial of this case was held, but the petitioner failed to present any reason for his absence from the trial. Samuel Pollack, supra.Mr. Ashenden was the only person other than the petitioner and Mr. Mehaffey at the 1964 meetings; he had information about the meetings which could have helped to decide the issues in this case. Graves v. United States, 150 U.S. 118 (1893); Kean v. Commissioner, 469 F.2d 1183 (C.A. 9, 1972), affg. 51 T.C. 337 (1968) and revg. an unreported order of this Court; Jacob S. Kamborian, supra; compare Krupsaw v. W.T. Cowan, Inc., 61 A.2d 624 (Mun. Ct. App. D.C. 1948). Mr. Ashenden was the petitioner's attorney and, by the time of the trial herein, *88 had been so for approximately 20 years. Such a long-standing confidential relationship indicates that he would be expected to favor her interests. Under such circumstances, we are justified in inferring from the petitioner's failure to call Mr. Ashenden that his testimony would not support her. She argued that her failure to call Mr. Ashenden was due to the fact that she learned about Mr. Mehaffey's statement only at the time of the trial; however, the trial lasted for 2 days, and there was no request to call him, nor was there a request for a continuance to call him at some later time. The petitioner argued that the Commissioner could have called Mr. Ashenden and that an inference adverse to the Commissioner's position should be drawn from his failure to do so. However, in view of the long-standing confidential relationship between Mr. Ashenden and the petitioner, we are satisfied that no inference should be drawn from the Commissioner's failure to call Mr. Ashenden. Similarly, we are convinced that no inference should be drawn from the Commissioner's failure to call any employees of the State who were connected with the awarding of the contracts to Mr. Mehaffey.Such employees*89 probably would have no knowledge of the relationship between Mr. Mehaffey and Mrs. Kub, and their interests are apt to be hostile to the position of the Commissioner. We are convinced that the Commissioner has proved that Mrs. Kub received payments from Mr. Mehaffey for obtaining State work for him. It is equally clear that such payments were to compensate Mrs. Kub for securing such work and that consequently such payments are compensatory. We now reach the question of whether Mrs. Kub's failure to report them was fraudulent. Mrs. Kub's Federal income tax returns for the years 1964 through 1966 reported only the interest earned on her savings accounts at Harris. In 1964, 1965, and 1966, Mrs. Kub was compensated $5,250, $8,900, and $10,150, respectively, by Mr. Mehaffey; she did not report any of such amounts on her returns for those years. Mrs. Kub initiated the contact with Mr. Mehaffey in 1964, suggested that she procure State work for him for which she would be compensated, and negotiated with him the amount of such payments. She received almost monthly payments in cash from Mr. Mehaffey over the course of the years 1964 through 1966. In view of such circumstances, any*90 claim of forgetfulness or carelessness is untenable. Compare John Marinzulich, 31 T.C. 487 (1958); L. Glenn Switzer, 20 T.C. 759 (1953). Mrs. Kub asked for and received the payments in return for promised services; they bear none of the hallmarks of gifts or loans. Compare William G. Stratton, 54 T.C. 255 (1970). She refused to have the Mehaffey checks drawn to her order and, in order to be paid in cash, agreed to a lesser amount than Mr. Mehaffey was otherwise willing to compensate her. Gromacki v. Commissioner, 361 F.2d 727 (C.A. 7, 1966), affg. a Memorandum Opinion of this Court; Steiner v. Commissioner, 350 F.2d 217 (C.A. 7, 1965), affg. a Memorandum Opinion of this Court. Mrs. Kub's consistent omission of the Mehaffey payments from her returns, her attempts to conceal the payments, and the fact that she had no reason to believe that they were not taxable income constitute clear and convincing evidence of fraud for all 3 years. Kathleen C. Vannaman, 54 T.C. 1011 (1970); Nathan Bilsky, 31 T.C. 35 (1958); compare John Marinzulich, supra.In addition, she persistently*91 refused to disclose the receipt of such payments to Mr. and Mrs. Charles who prepared her tax returns for her, despite their inquiries as to whether she received any income in addition to the interest on her savings accounts. Jacob D. Farber, 43 T.C. 407 (1965), as modified by 44 T.C. 408 (1965). While Mrs. Kub was receiving and not reporting the payments from Mr. Mehaffey, she was also selling some of the items from her collection of antiques and not reporting the proceeds of those sales. Though we do not have a complete record of the sales which she made to Mrs. Hull, we do know that there were two sales in 1965, three in January 1966, four in February 1966, and one in March 1966. The failure to report such sales cannot be judged in isolation. The refusal to report the Mehaffey payments established a pattern of conduct, and when the failure to report the proceeds of the sales of the items of antiques is viewed in the light of that pattern, it is clear that the failure to report such proceeds was merely an extension of such pattern. Nathan Bilsky, supra. Mrs. Kub reported only the interest on her savings account at Harris on her Federal*92 income tax return for the year 1967. Deposits totaling $1,086.50 were made in her checking account which were not withdrawals from her savings account. Three of such deposits stemmed from checks drawn to her by Mrs. Hull as payment for some antiques; such checks were all drawn in September 1967 and amounted to $936.50. Since the failure to report those sales is consistent with the pattern already established during the preceding years, we hold that such failure was deliberate and constituted fraud. Accordingly, Mrs. Kub also fraudulently under-reported her taxable income for 1967. 2. Deficiencies for 1964 Through 1967 The Commissioner relied on the bank deposits method in reconstructing Mrs. Kub's taxable income in order to determine the deficiencies for the years 1964 through 1967. In the course of such reconstruction, he treated all the bank deposits as ordinary taxable income, unless they could be traced to transfers from one account to the other. Mrs. Kub contended that such deposits reflected either deposits of accumulated cash or nontaxable loans made to her by Miss Reeder. Mrs. Kub's description of a cash hoard is too vague and sketchy to be accepted as a credible*93 explanation of the source of the bank deposits. She did not mention its size or location, nor did she give any indication of how long it took her to save such amounts and why suddenly, in 1964, she reversed her previous behavior and commenced depositing her savings in bank accounts. That testimony by Mrs. Kub is no more convincing than her testimony concerning the Mehaffey payments. Several aspects of the relationship between Mrs. Kub and Miss Reeder were unusual; nevertheless, we were impressed by the genuineness of Miss Reeder and were satisfied that she did make a number of loans to Mrs. Kub during the years 1964 through 1967. Even so, it is clear that those loans were not the source of most of Mrs. Kub's deposits. Wood County Telephone Co., 51 T.C. 72 (1968); compare Estate of Albert Rand, 28 T.C. 1002 (1957). A comparison of Mr. Mehaffey's record of payments to Mrs. Kub, the list of checks drawn by Miss Reeder for loans to Mrs. Kub, and the deposits in Mrs. Kub's bank accounts shows that most of the deposits coincided in time and amount with payments from Mr. Mehaffey and that very few of the deposits, if any, coincided with the time and amount*94 of loans by Miss Reeder. Of the 46 payments by Mr. Mehaffey to Mrs. Kub, similar amounts were deposited in Mrs. Kub's accounts on the same day on 8 occasions, on the day after on 18 occasions, on the second day after on 3 occasions, and on the third day after on 6 occasions. In addition, on a monthly average, Miss Reeder cashed, at most, $310 worth of checks during the period and loaned $217 to $248 a month to Mrs. Kub; whereas, Mrs. Kub's monthly deposits almost invariably exceeded such amounts. Other deposits in Mrs. Kub's bank accounts are traceable to the payments which she received from Mrs. Hull for the sale of her antiques. Mrs. Kub argued that the Hull checks which were deposited in her accounts and which were used by the Commissioner in reconstructing taxable income represented capital gains to her. The evidence concerning this issue amply supports the petitioner's position. She received the bulk of her collection from members of her family, maintained essentially the same items over a period of years, and made only intermittent sales from her collection. Miss Reeder and Mrs. Hull, who were both professionals in the field of antiques, considered Mrs. Kub a collector*95 as compared to a dealer of such items. Such circumstances indicate that Mrs. Kub was not in a "trade or business" of selling antiques and that her collection was a capital asset. Sec. 1221. The deposits in Mrs. Kub's accounts which were traceable to the Mehaffey and Hull checks clearly reflect taxable income, and she has failed to provide any satisfactory explanation as to the source of the other deposits. As a result, she must be considered not to have met her burden of proof on this issue, and the Commissioner's determination that they represented taxable income must be sustained, except that the proceeds of the sales of the antiques should be treated as capital gains and not ordinary income. Rule 142(a). 3. Penalties for 1962 The Commissioner determined that Mrs. Kub failed to file a Federal income tax return for 1962, that she was liable for the addition to tax under section 6651(a) because her failure to file a return for that year was not due to reasonable cause, and that she was liable under section 6653(a) for an addition to tax because her underpayment of tax for that year was due to negligence. The first of these issues to be dealt with is whether Mrs. Kub filed*96 a return for 1962, since if she has done so, the statute of limitations has run and any redetermination of her Federal income tax liabilities for such year is prohibited. Sec. 6501(a). The evidence presented is sufficient to justify a conclusion that Mrs. Kub did not file a return for 1962. The Commissioner's records do not show any return filed by her for that year. Moreover, her act of checking the "No" box on her 1963 return in response to the question whether she filed a return for 1962, her subsequent explanation that she had inadequate income to be required to so file, and her 1963 statement to Mr. Charles that she had not filed a 1962 return, are clearly admissions that she did not so file. In the face of such contemporaneous admissions, Mrs. Kub's later assertions that she did file a return for 1962 carry little probative force, and we hold that no such return was filed. The Commissioner's allegations that Mrs. Kub is liable for the additions to tax under sections 6651(a) and 6653(a) were first made in his answer, and as a result, he has the burden of proof with respect to such issues. Rule 142(a). He argued that she had sufficient income in 1962 to be required to*97 file an income tax return and that her statement on her 1963 return shows that her failure to file a return for 1962 and to pay a tax for that year were not due to honest mistakes. Her statement indicates that she was aware that as a result of the sale of her Barrington property, she was required to report some part of the gain; she asserted that she had not filed a return and reported such gain because the proceeds had been reinvested, but clearly, that statement was in error since the proceeds were deposited in her savings account. Her only defense was that she had relied upon others to prepare her return for her. In some situations, reliance upon a qualified tax adviser may relieve a person of the penalty. May T. Hrobon, 41 T.C. 476 (1964). However, Mrs. Kub has failed to show that she made a full disclosure of the facts to a qualified tax adviser; indeed, the evidence fails to show any reliance on anyone for 1962. For that reason, she cannot claim the benefit of the reliance rule, and we need not reach the other questions as to whether that rule could be applied in this*98 case. Accordingly, we hold that Mrs. Kub is liable for the penalties under sections 6651(a) and 6653(a). 4. Deficiency for 1962 The Commissioner determined a deficiency in Federal income taxes for the year 1962 on three items: (1) Interest income, (2) unexplained bank deposits, and (3) gain on the sale of a principal residence. The transcript of Mrs. Kub's savings account indicates that she had interest income in the amount alleged by the Commissioner in his brief. A comparison of Mrs. Kub's savings account and checking account transcripts indicates that she had deposits in her checking account, at least equal to the amount determined by the Commissioner, which were not redeposits from her savings account. Mrs. Kub argued that there were several alternative nontaxable sources of such funds. First, she alleged that she had accumulated cash over a period of time which she finally deposited. The cash hoard story has already been considered and rejected because of its vagueness. Second, although Mrs. Kub indicated that the unexplained deposits were the proceeds of loans made by Miss Reeder, those loans did not commence before 1964. Third, Mrs. Kub suggested that the bank deposits*99 stemmed from payments made her by her boarder, James Hetterman, but that explanation, even if true, would not help her, for any such payments would be taxable.Mrs. Kub conceded that she sold her Barrington property, which was her principal residence, in 1962, but disputes the amount of gain reportable as a result of such sale. When Mrs. Kub sold her Park Ridge property, which was her principal residence, the gain on such sale was not recognized by reason of section 1034(a), except to the extent that the adjusted sales price of the Park Ridge property exceeded the cost of the Barrington property. However, in computing the adjusted basis of the Barrington property under section 1034(e), the gain not so recognized on the Park Ridge sale is subtracted from the cost of purchasing the Barrington property and the costs of improvements thereon. The dispute in this case turns on the costs of the improvements to the Park Ridge property and to the Barrington property to be taken into consideration in applying those provisions. Initially, it is necessary to compute the gain realized by Mrs. Kub on the sale of her Park Ridge property. The parties agreed on the amount which she paid for*100 such property and the amount that she received for it; but the Commissioner contended that Mrs. Kub failed to prove that she spent any amounts for improvements on such property. Although she had no documentary evidence to support her claimed expenditures, it is reasonable to believe that an owner of property would have made some improvements to it. It would be reasonable to have purchased some of the items which she claims to have acquired, and the amounts spent for those items are within the realm of reason. See Quock Ting v. United States, 140 U.S. 417 (1891); Henry Schwartz Corp., 60 T.C. 728 (1973). For these reasons, we have found that she spent $2,875 for improvements to the Park Ridge property. Cohan v. Commissioner, 39 F.2d 540 (C.A. 2, 1930). In computing the gain on the sale of the Barrington property, the parties have agreed on the cost of such property. The Commissioner conceded that at least $15,032.44 was spent by Mrs. Kub for improvements to that property. Although Mrs. Kub claimed to have spent more for improvements to such property, we found her claim unconvincing since there was no convincing evidentiary support for*101 the additional claimed expenditures. Accordingly, we have found that she made only those improvements with respect to which the parties have agreed. Mrs. Kub also challenged the adjusted sales price used by the Commissioner in his computation of the gain on the sale of the Barrington property, claiming that she did not receive a $1,500.00 deposit that was made in connection with the sale of the property, but she had the burden of proof and failed to offer any evidence in support of her position. Hence, we found that she received the entire amount of $54,218.70. 5. Exemption for Blindness In her petition, Mrs. Kub claimed an exemption for blindness for each of the years at issue. Section 151(d) authorized such an exemption, and paragraph (3) thereof defines blindness as follows: (3) Blindness defined. - * * * an individual is blind only if his central visual acuity does not exceed 20/200 in the better eye with correcting lenses, or if his visual acuity is greater than 20/200 but is accompanied by a limitation in the fields of vision such that the widest diameter of the visual field*102 subtends an angle no greater than 20 degrees. Mrs. Kub has the burden of proving her right to such an exemption, and she has utterly failed to offer any evidence to establish that she was blind within such definition. The only evidence offered by her was her claim that she was suffering from glaucoma. However, other evidence indicated that she was able to travel about the city of Chicago without assistance. It is clear that she has failed to prove that she is blind within the definition of section 151(d) (3), and hence, we hold that she is not entitled to the exemption for blindness. Decision will be entered under Rule 155. Footnotes1. All statutory references are to the Internal Revenue Code of 1954. ↩2. Check numbers 5112 and 5452 were mistakenly recorded on the Illinois State jobs sheet as 5113 and 5450, respectively. ↩3. All references to Rules are to the Tax Court Rules of Practice and Procedure. The trial of this case took place prior to the effective date of those Rules, but 31(a) of the Rules of the Tax Court, which were applicable at the time of the trial, is substantially the same as 143(a) of the present Rules. ↩