WOOD COUNTY TELEPHONE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 971–66. Filed October 21, 1968.

*Roger L. Gierhart* and *James Siehr,* for the petitioner.
*Robert M. Burns,* for the respondent.

WITHEY, Judge: Respondent determined a deficiency in petitioner's corporate income tax for the calendar year 1962 in the amount of $29,710.78.

The principal issue presented is whether petitioner is entitled to an abandonment loss under section 165 of the Internal Revenue Code of 1954 [1] in the amount of $57,136.12 in connection with its acquisition of the Rudolph Telephone Co. (hereinafter referred to as Rudolph) in 1961 and its subsequent disposition of most of Rudolph's manual telephone equipment in 1962.

### FINDINGS OF FACT

Some of the facts have been stipulated and are found accordingly.

Petitioner is a Wisconsin corporation organized in 1895. On March 3, 1966, the date the petition was filed, its principal office was in Wisconsin Rapids, Wis. For the taxable year 1962, it filed its Federal corporate income tax return on the accrual basis of accounting with the district director of internal revenue, Milwaukee, Wis.

Petitioner is a public utility company regulated under the laws of the State of Wisconsin. It furnishes telephone services to the cities of Wisconsin Rapids, Nekoosa, Port Edwards, and surrounding rural areas. In Wisconsin, telephone companies operate under a permit for an indeterminate period rather than under a franchise.

Prior to September 1961, Rudolph, an adjacent telephone company, had provided its subscribers with "extended area service" [2] to the Wisconsin towns of Junction City and Vesper, lying to the north and west of Rudolph's territory, respectively. By September or October 1961, Central States Telephone Co., which served the area north and west of the Rudolph territory, was in the process of converting from a manual to a dial system, and the conversion was to be com-

---

[1] All statutory references are to the Internal Revenue Code of 1954.

[2] "Extended area service" permitted Rudolph subscribers to call outside the Rudolph territory at no additional charge. It appears from the record that this service was limited to those telephone territories immediately adjacent to the Rudolph territory.

pleted by the spring or early summer of 1962. The Wisconsin Telephone Co., which served the area east of the Rudolph territory, had been converted to a dial system for a number of years and petitioner, who served the area south of Rudolph, had converted to a dial system in 1959. The modernization of facilities by Rudolph's neighboring phone companies would have required Rudolph to convert its facilities to either a dial system or carrier service [3] in order to continue providing its subscribers with extended area service to Junction City and Vesper. However, because of the expense involved in converting to either carrier or dial system, the majority of Rudolph's board of directors had decided to make an offer to sell its assets to petitioner. Toward this end, representatives of Rudolph, including its president and secretary-treasurer, met with petitioner's president sometime between September 15 and 21, 1961, to discuss the terms of a prospective sale of Rudolph's assets to petitioner. At this meeting, the discussion was directed to the purchase of Rudolph's physical assets and it was agreed that the purchase price would reflect the net book value of Rudolph's assets as of October 31, 1961. The question of goodwill was never mentioned, nor was there any discussion about the purchase of customer lists, the right to service the Rudolph area, the value of Rudolph's customers, or the purchase of any other intangibles. However, petitioner's right to service the telephone needs of the Rudolph territory was dependent upon its obtaining an appropriate order from the Public Service Commission of Wisconsin, and the only practical means for obtaining that order was to purchase Rudolph's assets. At the time petitioner purchased Rudolph's assets, including land, they had no value to petitioner absent the granting of an appropriate order by the Commission.

Within a few days after the September meeting, petitioner began a physical inspection of Rudolph's plant and equipment, and approximately 30 days after that meeting the inspection had been completed and petitioner had compiled and had in its possession a budget report estimate entitled "Rebuild Rudolph Area Outside Plant, and Install Dial Central Office Equipment at Rudolph." [4]

A written "Offer to Sell," dated October 13, 1961, and containing elements of the September discussion between petitioner and Rudolph,

---

[3] "Carrier service" is a system whereby the voice is transmitted between two different exchanges by use of radio signals rather than wires, whereas "dial service" employs a wire system to achieve the same results. Both systems, or services, are automatic and alleviate the need for manual switching by a central operator.

[4] This report reflected the dollar amount of physical assets required to be abandoned in converting from a manual to a dial system, as well as the salvage value of those assets. The report estimated that work on the conversion to a dial system could be completed by Sept. 1, 1962, if begun by Jan. 1, 1962.

was submitted to petitioner by Rudolph. The document provided, in part, that Rudolph would sell:

all of its assets as reflected by the annual report of the Seller [Rudolph] to the Wisconsin Public Service Commission dated December 31, 1960, exclusive of cash, and all additions to assets from January 1, 1961, through October 31, 1961, exclusive of cash, at the price of $59,100.00 plus the cost of said additions to assets less 1961 depreciation * * * on the following terms and conditions, to-wit:

1. The Seller will pay all of its income and excise taxes for the year 1961.

2. The Seller will pay the $11,300.00 of outstanding bonds and notes and accrued interest thereon.

3. Subject to the foregoing, the Buyer will assume and pay all current liabilities of the Seller as of the close of business October 31, 1961, and any utility or gross receipts tax of the Seller, hereafter required to be paid, without proration.

4. The Buyer will take over the business of the Seller and operate the same as of the beginning of business on November 1, 1961, and all income from that time shall belong to the Buyer, which shall also assume and pay any and all obligations incurred from that time.

5. The Buyer agrees to furnish extended area service to all Rudolph subscribers in Auburndale, Junction City, Vesper, and Wisconsin Rapids.

6. The purchase price shall be paid on or before December 1, 1961, and the Seller shall, upon payment of the purchase price, convey the property by good and sufficient Warranty Deed and Bill of Sale. The Seller shall furnish an abstract to any real estate included in this offer.

No appraisal had been made of the Rudolph assets as of November 3, 1961, the date on which petitioner accepted Rudolph's offer to sell. On November 1, 1961, petitioner began operating the former Rudolph facilities. The letter of acceptance provided, in pertinent part, that petitioner accepted Rudolph's offer under the following conditions:

1. That this acceptance is subject to the approval of the Public Service Commission of Wisconsin.

2. That the phrase "Rudolph subscribers" as set forth in paragraph 5 of said offer, shall be agreed to mean those subscribers of the Rudolph Telephone Company, receiving Rudolph Exchange service.

3. That the conditions of paragraph 5, as to the extended area service to Wisconsin Rapids, shall be placed into effect upon the conversion of said Rudolph Exchange to dial operations.

The purchase of the Rudolph facilities was consummated by a "Bill of Sale" which was executed on November 30, 1961, and on December 1, 1961, petitioner paid Rudolph a purchase price of $63,483.55 which was raised from the original contract price of $59,100, to reflect asset and depreciation adjustments as provided for in the offer to sell. On February 12, 1962, the Public Service Commission of Wisconsin entered its order granting the "Joint Application of the Rudolph Telephone Company for Authority to Sell and of the Wood County Telephone Company to Buy the Rudolph Telephone Company's Telephone Property."

Of the total purchase price paid to Rudolph, petitioner allocated $55,708.03 to physical assets and $7,236.72 to "Telephone plant acquisition adjustment." This $7,236.72 adjustment figure was arrived at as follows:

| | | |
|---|---|---|
| (1) | Excess purchase price over book cost of assets | $4,931.13 |
| (2) | Materials and supplies 10/31/61 | 2,522.89 |
| (3) | Prepaid insurance 10/31/61 | 321.50 |
| (4) | Public Service Commission costs | 63.18 |
| (5) | Central State Telephone Supply | 41.00 |
| (6) | Excess cost of gross license tax | 202.52 |
| | Total | 8,082.22 |
| | Less error in purchase price | 623.93 |
| | Less error in omitting additional personal property | 221.57 |
| | Net "Telephone plant acquisition adjustment" per return | 7,236.72 |

During 1959 petitioner had completed the conversion of its own facilities from a manual system to a dial system and was aware, prior to the acquisition of Rudolph's assets in 1961, of the type of manual assets that had to be discarded in such a conversion. At the time petitioner acquired Rudolph's assets in 1961, it intended to convert Rudolph's telephone facilities from a manual to a dial system as soon as was physically possible.[5] The actual conversion was completed on October 1, 1962, and on that day, nearly all facilities formerly used by Rudolph were abandoned [6] and Rudolph's former customers were changed over to the new facilities and all local calls were thereafter handled automatically through the dial system.

Rudolph had been financially successful prior to the sale of its assets to petitioner, had realized net profits in the year of sale, 1961, and in each of the preceding 5 years, and its facilities were in good operating condition at the time of sale. Petitioner is still servicing the former Rudolph territory and the number of customers in that territory has increased.

At the time the offer to sell was made, nearly 100 of Rudolph's approximately 582 subscribers were connected directly with petitioner's dial exchange in Wisconsin Rapids, but were customers of Rudolph and billed by Rudolph.

These customers were referred to as Rudolph subscribers "switched" through petitioner. As switched subscribers these customers, unlike the approximately 482 remaining Rudolph subscribers, were able to telephone at no additional charge to Wisconsin Rapids as well as any

[5] Petitioner was required by the Wisconsin Public Service Commission to continue operating the Rudolph facilities as a manual system until it could be converted to a dial system. The conversion required a complete duplication of the telephone plant with new instruments and removal of the former physical assets.

[6] On Oct. 31, 1962, the net book value of all assets acquired from Rudolph was $50,574.28 although the net book value of the "Retained Plant" was only $1,874.16.

other area served directly by petitioner. The other 482 subscribers had manual receivers and when they lifted their receivers, they were in contact with the switchboard at Rudolph. However, if they wished to speak with someone in Wisconsin Rapids, the operator at Rudolph would connect them with petitioner's exchange in Wisconsin Rapids and for that service the customers were required to pay a toll charge. Of these 482 customers, approximately 64 had signed a petition dated August 30, 1961, requesting Rudolph to provide "switched line service" into the petitioner's Wisconsin Rapids exchange. At the time petitioner was negotiating for the purchase of Rudolph's assets, its management had heard generally of the petition but was not aware of its precise details. However, in order to get acquainted with all the Rudolph subscribers and to better determine the kind of service they desired, representatives of petitioner met with the former Rudolph subscribers at a meeting held on November 8, 1961. Subsequently, petitioner determined, by a survey and questionnaire, that these customers wanted better service than they had received from Rudolph. As a result of this determination, and in order to provide the kind of service desired by these customers, more of Rudolph's facilities had to be abandoned than was originally anticipated.

On its Federal income tax return for the taxable year 1962, petitioner claimed a deduction from gross income of $57,136.12 for "loss on property abandoned" in connection with the Rudolph acquisition and subsequent conversion to dial. This "loss" was computed as follows:

| | | |
|---|---|---|
| Net book value, 10/31/61 | | $55,708.03 |
| Plus: Cost of removal | | 8,292.75 |
| Subtotal | | 64,000.78 |
| Less: Depreciation, 11/1/61 to 10/31/62 | $5,133.75 | |
| Salvage (as of 10/31/62) | 7,093.47 | |
| Retained plant | $12,191.90 | |
| Less: Reserve on retained plant | 10,317.74 | 1,874.16 |
| | | 14,101.38 |
| Balance | | 49,899.40 |
| "Telephone plant acquisition adjustment" | | 7,236.72 |
| "Loss on Property Abandoned" claimed per return | | 57,136.12 |

The Commissioner, in his notice of deficiency, disallowed the deduction in its entirety.

### OPINION

In an attempt to increase its territory and customers, petitioner purchased the entire assets of Rudolph on November 30, 1961. At the time of purchase, petitioner intended to convert the Rudolph facilities

from a manual to a dial system as soon as was physically possible and petitioner realized that in order to accomplish this modernization program it would have to scrap most of Rudolph's plant and equipment. By October 1, 1962, the conversion of Rudolph's former facilities to a dial system was completed by petitioner and on that day most of the facilities formerly used by Rudolph were abandoned.

The threshold question is whether petitioner is entitled to a loss deduction under section 165 for the former Rudolph facilities which it abandoned on October 1, 1962. Respondent contends that a loss, to be deductible, must arise from the unintentional or involuntary loss of property, and since the facts in the instant case reveal that at the time petitioner purchased Rudolph's assets it intended to abandon most of them as soon as was physically possible, the abandonment was clearly an intentional and voluntary act which precludes petitioner from obtaining a loss deduction. Petitioner, on the other hand, contends that it did not purchase the Rudolph facilities with the intention of abandoning them. In light of the facts presented by the record, we must sustain respondent's position.

The law is now well settled that a loss, in order to be deductible, must involve the unintentional or involuntary loss of something of value. *Dresser* v. *United States*, 55 F. 2d 499, 510 (Ct. Cl. 1932), certiorari denied 287 U.S. 635 (1932); *McDonald* v. *Commissioner*, 139 F. 2d 400, 402 (C.A. 3, 1943), affd. 323 U.S. 57 (1944); *Providence Journal Co.* v. *Broderick*, 104 F. 2d 614, 616 (C.A. 1, 1939). Of more direct effect on the disposition of this case, however, is the Commissioner's regulation and the many decided cases which have established the rule that where a taxpayer purchases real property improved by a building and at the time of the purchase harbors the intention of demolishing the building, he is not allowed a loss deduction under section 165 on account of the eventual demolition of the building, but must allocate the basis for the building to the underlying land. Sec. 1.165–3(a)(1), Income Tax Regs.; *Hillside National Bank*, 35 T.C. 879 (1961); *N. W. Ayer & Son, Inc.*, 17 T.C. 631 (1951); *Lynchburg National Bank & Trust Co.*, 20 T.C. 670 (1953); *Providence Journal Co.* v. *Broderick*, *supra*. In *Columbus Brick & Tile Co. Et. Al.*, 26 B.T.A. 794 (1932), it was held, relying on the real-estate-demolition cases, that where petitioner purchased a brick plant with the intention of discarding some of the machinery thereon, petitioner was not entitled to a loss deduction on the cost of the discarded machinery since the intention to discard had been formed prior to the acquisition of the brick plant.

While the rationale for the rule established by the foregoing cases is seldom mentioned, it appears to be founded upon the proposition that if a taxpayer has the intention, at the time of purchase, to demol-

ish an improvement on real property, he obviously is interested in acquiring only the land, and for that reason the basis of the demolished property is allocated only to land, thereby reflecting the actual intention of the purchaser. Similarly, respondent analogizes the instant case to the real-estate-demolition cases and contends that inasmuch as petitioner had the intention, at the time it purchased the Rudolph assets, to abandon virtually all of them as soon as the Rudolph facilities could be converted from a manual to a dial system, petitioner thereby clearly evidenced a desire to obtain something other than the actual assets purchased. At this point, however, the analogy to the real-estate-demolition cases ends inasmuch as the facts disclose that petitioner purchased the Rudolph assets, not to acquire the underlying land but rather to expand its telephone service so as to encompass the territory and customers of Rudolph. Consequently, respondent contends that the basis of the assets abandoned should be allocated, not to land as in the real estate demolition cases, but to the nondepreciable right to service Rudolph's former territory and customers, an intangible right with no determinable useful life.

While it is true that the right sought by petitioner could, in a technical sense, only be granted by the Public Service Commission of Wisconsin and not by Rudolph, as a practical matter petitioner would have ordinarily been unable to acquire that right without Rudolph's willingness to cease doing business in its territory. Furthermore, the parties to the sale understood, and petitioner's acceptance specifically indicated, that the sale of Rudolph's assets was conditioned upon petitioner being able to obtain the necessary approval from the State regulatory agency. Petitioner's president testified that without the right to service the former Rudolph customers, the assets would have had no value to petitioner.

Petitioner contends however that since, during the negotiations which led to the sale of Rudolph's assets, the discussion never involved the sale of goodwill, customer lists, or any other intangible, and since petitioner agreed to a purchase price which was equal to the adjusted basis of the assets on Rudolph's books as of October 31, 1961, it follows that petitioner was buying tangible assets only. While we are in agreement with petitioner as to the facts relied upon in making its argument, we cannot agree with petitioner in the conclusion it seeks to draw from those facts. From the totality of evidence before us, we are convinced that petitioner was interested in acquiring the Rudolph assets for the sole reason that by doing so it would be able to expand its telephone operations. The fact that petitioner was willing to pay Rudolph its adjusted basis of the assets acquired in no way forecloses our conclusion that petitioner was only interested in buying the right to service Rudolph's territory and not Rudolph's plant and equipment. Even if

the fair market value of the assets acquired had been equal to the price petitioner paid, our conclusion would be no different. The facts disclose, however, that no appraisal was made at the time of the negotiations or at the time of sale, an omission on petitioner's part which further supports our conclusion. The parties have stipulated that as of October 31, 1962, which was less than 1 month after petitioner's conversion to a dial system, the salvage value of all assets acquired from Rudolph was only $7,093.47, an amount considerably less than the total adjusted book value of those same assets on that date, i.e., $50,574.28. In addition, since the cost of removing the abandoned assets amounted to $8,292.75 and their salvage value was only $7,093.47, and since petitioner knew, at the time of purchase, that it would be necessary to abandon those assets in converting to a dial system, we feel compelled to hold that petitioner placed no value whatsoever on those assets, a conclusion specifically supported by the testimony of petitioner's president. Although we have found that subsequent to a meeting with subscribers on November 8, 1961, petitioner determined the need to abandon more facilities than were originally anticipated, this fact is of no assistance to petitioner for two reasons. First, petitioner has failed to prove that the determination, though made subsequent to November 8, 1961, was made subsequent to the date of sale, November 30, 1961. Secondly, even if it be assumed that the determination was made after the date of purchase, the fact still remains that petitioner's intention at the time of purchase to abandon the acquired property was not limited to only that property encompassed in their preliminary survey, but included any such property necessary to be discarded in order to carry through its purpose of converting the system to dial.

Petitioner, in the alternative, contends that even if we determine that the purchase price, or some part thereof, was for the right to service Rudolph's former territory, that right was an intangible asset of a nature subject to depreciation, having a determinable life equal to that of the physical facilities purchased. Petitioner then suggests that since the physical facilities acquired from Rudolph were abandoned upon petitioner's conversion to a dial system, less than a year from the date of their acquisition, the conversion marked the end of their useful life and, pursuant to section 167(a) and section 1.167(a)–3, Income Tax Regs., petitioner was entitled to a depreciation allowance on the unrecovered basis of the abandoned property. In attempting to obtain a depreciation deduction on the intangible asset involved, petitioner recognizes the necessity of ascribing some useful life to that asset. However, by equating the useful life of a right to service a telephone territory with the life of the physical assets which were acquired with the intention of being abandoned, petitioner has substituted his imagination for the facts in this case. The parties have stipulated that

telephone companies in Wisconsin operate under a permit for an indeterminate period. Since it is that permit which gives the utility company the right to service a particular territory, and since we have concluded that petitioner purchased the assets of Rudolph in order to acquire the right to service the former Rudolph territory and customers, we think it follows that the useful life of that right is equivalent to the life of the permit, i.e., an indeterminate period. It follows, therefore, that petitioner's right is not subject to a depreciation allowance and the purchase price attributable to the assets abandoned are therefore part of petitioner's capital investment.

Petitioner finally contends that aside from its claimed abandonment loss it is entitled to deduct, as an ordinary operating expense, $8,292.75 for removing the abandoned assets, and $3,151.09 for certain expenses allegedly incurred in 1961 and paid in 1962 in the operation of its business prior to its conversion to a dial system.

Petitioner's claimed deduction for the cost of removing the abandoned property is premised upon a duty to remove abandoned property, which it contends was allegedly imposed upon it by State statute. The existence vel non of such a State-imposed duty cannot alter petitioner's right to the claimed deduction under the facts presented. As we have already held, at the time petitioner acquired the former Rudolph assets it had formulated an intention to abandon most of the property as soon as was physically possible. In addition, even prior to accepting Rudolph's offer to sell, petitioner's engineers had completed an estimate of the cost of converting Rudolph's facilities from a manual to a dial system. The fact that petitioner had experienced a similar conversion of its own facilities to a dial system several years earlier put it on notice of the cost of removing abandoned telephone equipment. The real-estate-demolition cases relied upon, *supra*, make no distinction between the value of the property demolished and the cost of physically removing that property. The total cost occasioned by the demolition and removal is treated as one expense and charged to capital investment. Consequently, petitioner's cost of removal must be treated in the same manner as the abandoned property and attributed to the intangible right to service the former territory and customers of Rudolph. *Hillside National Bank*, *N. W. Ayer & Son, Inc.*, and *Lynchburg National Bank & Trust Co.*, all *supra*.

Petitioner seeks to deduct the amount of $3,151.09 as an ordinary business deduction paid during the year in question. That amount, constituting a portion of the "Telephone Plant Acquisition Adjustment" which was included in the claimed abandonment loss, represents the following alleged expenses: Materials and supplies, prepaid insur-

ance, Public Service Commission costs, Central State Telephone Supply, and excess cost of gross license tax. The only evidence bearing on these supposed expenses was provided by petitioner's auditor, a man who had been employed by petitioner since 1950. In addition to the usual bias associated with a witness who has been a long-time employee of the party calling him, this witness was sufficiently impeached so as to render his testimony unreliable. While petitioner may have had other records or personnel available for proving the deductibility of these alleged business expenses, it failed to present them. Accordingly, we must hold, on a failure of proof, that petitioner is not entitled to deduct the $3,151.09 claimed.

*Decision will be entered for the respondent.*