**J. B. N. TELEPHONE COMPANY, INC.,**
**Plaintiff-Appellee,**

v.

**UNITED STATES of America,**
**Defendant-Appellant.**

No. 77–1950.

United States Court of Appeals,
Tenth Circuit.

Argued April 17, 1979.

Decided Jan. 15, 1981.

Libero Marinelli, Jr., Atty., Dept. of Justice, Washington, D. C. (M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and Ann Belanger Durney, Attys., Dept. of Justice, Washington, D. C., and James P. Buchele, U. S. Atty., Topeka, Kan., were on the brief), for defendant-appellant.

James M. Caplinger, Topeka, Kan., for plaintiff-appellee.

Before HOLLOWAY, DOYLE and LOGAN, Circuit Judges.

HOLLOWAY, Circuit Judge.

Plaintiff-appellee J.B.N. Telephone Co., Inc. (J.B.N.) claimed a deduction on its 1972 federal income tax return for a loss resulting from the abandonment of obsolete telephone equipment. The Internal Revenue Service disallowed the deduction and issued a notice of deficiency on the ground that J.B.N. simultaneously acquired and abandoned the equipment and therefore had no basis in it. J.B.N. paid the deficiency, filed a refund claim, which the I.R.S. denied, and then commenced this refund suit. Pursu-

ant to a jury verdict,[1] the district court entered a judgment for J.B.N. in the amount of $27,737.18, with interest and costs, representing a refund of taxes paid for 1972. The Government appeals.

I

*The factual background*

In late 1969, J.B.N. contracted to purchase five small manually operated telephone exchange businesses in the towns of Agenda, Cuba, Mahaska, Munden, and Narka, Kansas. The sale contracts were essentially identical.[2] All of the telephone systems were manually operated. Under the sale agreements J.B.N. was to immediately begin conversion of the systems from manual to automatic dial operation.

Each agreement provided for a small down payment at the time of execution. The balance was to be paid at the closing date, at which time the bills of sale and warranty deeds for the tangible property were to be delivered to J.B.N.[3] The closing date for each sale was to be at the time the system was converted to dial operation, but, except in the case of the Cuba exchange, in any event no later than two years from the date of execution. One principal issue before us is whether J.B.N. acquired the telephone equipment for tax purposes at the time the agreements were executed or on the closing dates.

Each contract provided:

4. *Conduct of the SYSTEM prior to Closing Date.* Between the date of execution of this Agreement and the Closing Date, SELLER shall preserve the SYSTEM as a going business; shall not enter into any contracts relating to the SYS-TEM other than such as are incidental to its normal current operation; shall not make any changes in rates charged or wages or salaries paid in connection with the SYSTEM; and shall not dispose of any part of the SYSTEM, without the written consent of the PURCHASER.

During the periods between execution and closing, the sellers were entitled to all the income from and responsible for all expenses of operation of the exchange and were liable for all taxes. Any capital additions made by the sellers had to be approved by J.B.N. and their costs were to be added to the purchase prices paid by J.B.N. for the systems.

J.B.N.'s purchase obligations were conditioned upon the sellers providing good and marketable title to the systems and upon its obtaining the requisite approvals from the Kansas Corporation Commission (the Commission) authorizing it to operate the systems. On October 22, 1969, shortly after execution of the sale agreements, the Commission issued orders granting certificates of convenience and authority, effective immediately, permitting J.B.N. to operate the five systems.

At the trial, Lloyd W. Shank, who was Director of Utilities for the Commission at the time the orders were issued, testified that in the period between the granting of the certificates and the completion of the conversions, both J.B.N. and the selling companies were responsible for the provision of service, but that the primary responsibility fell on J.B.N. II R. at 92. If, for example, one of the systems were destroyed by a storm, J.B.N. would have been required to rebuild it and restore service. *Id.* at 93–4.[4] Robert C. Carson, president and

---

1. The trial judge submitted the case to the jury for a general verdict for either the plaintiff or defendant, there being no controversy raised as to the amount of the recovery if plaintiff was found entitled to the deduction.

2. The agreements and certificates of convenience issued by the Kansas Corporation Commission were introduced into evidence as Exs. 2–6, I R. at 242–295.

3. In actuality, the warranty deeds for the real property acquired from the five sellers were recorded approximately one year prior to the closing dates. Request for Admissions 6, I R. at 66, 94.

4. Paragraph 10 of the Agenda agreement provided that in the event seller should become unable to operate the system prior to conversion, J.B.N. agreed to enter into an "operating agreement" under which J.B.N. would operate the system and be entitled to the net revenues

manager of J.B.N., testified that in the period prior to the completion of conversion J.B.N. did provide some necessary repair service, other than normal maintenance, on the old magneto system. *Id.* at 64.

The conversions were completed in late 1971. For a transitional period of perhaps as long as a couple of weeks, both the old magneto and the new dial system were in operation. All the magneto system equipment was scrapped during 1971. *Id.* at 66, 80.

In June 1972, J.B.N. obtained an inventory of the scrapped equipment. *Id.* at 80. In late 1972 it applied for an accounting order from the Commission permitting it to write off the abandoned equipment. On January 31, 1973, the Commission issued the accounting order, permitting amortization of the cost of the equipment over a twenty year period beginning in 1972, for which year J.B.N.'s books were still open. Ex. 7, I R. at 296.

Of the total amount paid for the five telephone exchanges, J.B.N. allocated $42,014.36 to the abandoned personal property and $32,014.48 to the intangible right to do business. J.B.N. claimed no depreciation deductions for the equipment between 1969 and 1971. In 1972, J.B.N. claimed a deduction of $42,014.36 for the abandonment of the equipment, which deduction is the subject of this controversy.

For reversal, the Government argues essentially that J.B.N. was not entitled to an abandonment or loss deduction for 1972 for equipment acquired as part of the purchase of exchange businesses as the equipment was abandoned simultaneously with transfer of ownership in 1971; that a loss deduction is not allowable as to the abandoned property because at no time did the taxpayer have any basis in it; and that even if J.B.N. is entitled to a loss deduction, it may not be taken for 1972 as the property became obsolete and was abandoned in 1971.

Additionally, taxpayer's claim for relief under the mitigation sections (26 U.S.C. § 1311–15) lacks merit because J.B.N. was not barred from asserting a 1971 refund claim when the Service disallowed the deduction for 1972.

## II

### J.B.N.'s entitlement to a deduction

■ When a depreciable asset used in a taxpayer's business becomes worthless due to its obsolescence or its being abandoned or no longer being used by the taxpayer, he is entitled to a deduction. Obsolescence is a factor in the determination of a depreciation deduction under Section 167 of the Internal Revenue Code, and loss resulting from the abrupt termination of the use of a depreciable asset is governed by Section 1.167(a)–8 of the Income Tax Regulations. However, it has been held that the statutory authority for a deduction due to the sudden obsolescence of a depreciable asset is the loss provision of § 165(a). *Coors Porcelain Co. v. Commissioner,* 52 T.C. 682, 692, *aff'd* 429 F.2d 1 (10th Cir.) (in affirming, this court did not reach the question of whether Section 165 or Section 167 governs); *see* 4 Mertens, *Law of Federal Income Taxation,* § 23.108 at 340, n.1.[5]

*First,* we have the question whether J.B.N. is barred from claiming any basis in the property because of an intention to abandon the equipment from the outset, as the Government argues. When a taxpayer purchases a number of assets in a single transaction, his basis must be allocated among the individual assets in proportion to their fair market values at the time of purchase. *See* Regs. § 1.167(a)–5. If a taxpayer purchases a group of assets with the intention of abandoning some of them at the time of purchase, the abandoned properties are deemed to have a zero basis on the theory that they have no value; therefore, abandonment of the assets does

therefrom. I R. at 250. There is no such clause in the other four agreements.

5. Here, the trial court instructed the jury that section 167 applied. Instruction No. 6, II R. at 210–11. Although the Government objected at trial that Section 165 was the proper provision, which section is deemed to apply is immaterial to the outcome of this case.

not give rise to a deduction. *See, e. g., Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240, 1262 (5th Cir.), *cert. denied*, 414 U.S. 1129; *Hillside National Bank v. Commissioner*, 35 T.C. 879, 881; Regs. § 1.165–3(a).

In *Wood County Telephone Co. v. Commissioner*, 51 T.C. 72, the taxpayer purchased a telephone system with the intent of converting it from manual to dial operation as soon as physically possible. Conversion took place within a year of the purchase. (November 30, 1961, purchase to October 1, 1962, when actual conversion was completed). On October 1, 1962, nearly all the facilities formerly used by the seller were abandoned. *Id.* at 75–76.

The taxpayer allocated the entire purchase price to the abandoned equipment and claimed a deduction accordingly. Despite the fact that the taxpayer used the manual equipment for almost a year, the court disallowed the deduction in its entirety, stating that "since the cost of removing the abandoned assets amounted to $8,292.75 and their salvage value was only $7,039.47, and since petitioner knew, at the time of the purchase, that it would be necessary to abandon those assets in converting to a dial system, we feel compelled to hold that petitioner placed no value whatsoever on those assets. . . ." *Id.* at 80.

In contrast the court held in *W E G Dial Telephone, Inc. v. Commissioner*, 25 T.C.M. 233, that where the taxpayer used manual equipment for differing periods of a year and a half to almost two years after purchase until completing conversion to a dial system, it was entitled to an abandonment deduction. *Id.* at 243. It was recognized that at the time of acquisition the taxpayer intended to alter the facilities to provide dial service. It knew at the times of acquisition that all of the facilities acquired would not be suitable for the dial operation. *Id.* at 239. Petitioner did not intend, however, to demolish any of the facilities at the time of their acquisition. *Id.* at 239–40. As

to the Santa Fe facility, the court rejected the argument that use of the old facility was never intended; since the buyer was required to continue manual service until conversion, the property was used until that time. *Id.* at 243. The fact that the obsolescence and subsequent abandonment of the equipment were foreseeable and planned at the time of purchase was considered however by the court in determining the portion of the total purchase price attributable to the equipment. *Id.* at 241–42.

The result in *W E G Dial* is a sound one since, if a taxpayer intends to make use of an asset, even if he plans at the time of acquisition to abandon it in the foreseeable future, the asset obviously has some value to him. The holding there is in accord with Reg. § 1.165–3(a)(2), 26 CFR § 1.165–3(a)(2) (1971). In the instant case, in light of the circumstances and the jury verdict, we feel that the decision in *W E G Dial* logically supports J.B.N.'s position.

*Second*, we must consider whether J.B.N. "acquired" the manual equipment when the purchase agreements were executed in 1969 and was then using this equipment in its own operations thereafter so as to be entitled to the deductions when the equipment was later abandoned after the conversions.

The Government argues that, as a matter of law, the transfer of ownership did not take place until the conversions were made, since the selling companies operated the telephone exchanges in the interim periods and received all the revenues and were liable for all the expenses; hence there was no use of the equipment by J.B.N. and it had no right to a deduction for the abandonment of the equipment. J.B.N., on the other hand, says that the contracts were binding once the Commission issued its certificates in late 1969. It claims that the contracts established an agency relationship during the interim periods under which J.B.N. owned the equipment and the sellers operated it as J.B.N.'s agents.[6] J.B.N. fur-

---

6. Robert Carson testified that the arrangement was motivated by the fact that if J.B.N. operat- ed the manual systems it would have been required to pay the minimum wage to the em-

ther stresses the fact that under the certificates, it was primarily responsible for maintenance of service during the interim period.

■ In determining when a transfer of property is deemed to occur for tax purposes, this court has held that the passage of legal title is not controlling. *Wagner v. Commissioner,* 518 F.2d 655, 657 (10th Cir.). "The test used is [when] the 'benefits and burdens' of ownership passed...." *Id.* at 657. In *Wagner,* the taxpayer contracted to purchase a building subject to a lease which would not expire for slightly over a year. Before expiration of the lease, the seller was entitled to the rental payments under it and liable for the payment of taxes and insurance on the building. The taxpayer was not liable for interest on the unpaid portion of the purchase price until the lease expired. The warranty deed transferring title to the property was placed in escrow, pending the buyer's payment of all installments on the purchase price. The court held that at the time of the execution of the contract the "benefits and burdens" of ownership had passed to the taxpayer so as to entitle it to claim depreciation deductions immediately, rather than having to await the expiration of the lease. The court emphasized that the contract of sale was unconditional and that the taxpayer accepted the property in its condition as of the date of execution of the contract. *Id.* at 659.

In *Baird v. Commissioner,* 68 T.C. 115, a similar issue arose in a case involving the purchaser's claim of a right to a depreciation deduction, *inter alia.* The court said that the question of when a sale is complete for tax purposes is essentially one of fact which must be resolved by examining all the facts and circumstances, no one of which is controlling; that the focus is on a consideration of when the benefits and burdens of ownership have shifted. *Id.* at 124. The court found that the parties intended that the accoutrements of ownership pass at the time of the preliminary agreement, conditioned only on consummation of financing arrangements; that the purchaser

became the equitable owner at the time of the preliminary agreement; and that he was entitled to deduct depreciation starting in the following month when the property was actually placed in service. *Id.* at 128 and n.10.

The Government claims that the time of transfer is a question of law, while J.B.N. argues that it is a question of fact. It is true that in *Wagner* we held that "the question is a legal one as to the consequences of the agreement." 518 F.2d at 658. Here, however, unlike the situation in *Wagner,* where the relationship between buyer and seller was clearly defined by the written contract of sale, the relationship between J.B.N. and the selling companies must be examined in light of the responsibilities imposed by the Commission and the intentions of the parties, as well as the agreements. We must consider all the facts and circumstances, no one of which is controlling. *Baird v. Commissioner, supra,* 68 T.C. at 124. We conclude that here the question was a factual one as to whether J.B.N. had the burdens and benefits and effectively operated the systems from 1969 on so as to be able to claim the deduction for the abandonment.

In *Frank Lyon Co. v. United States,* 435 U.S. 561, 98 S.Ct. 1291, 55 L.Ed.2d 550, the Supreme Court decided a question as to who had the right to deductions for depreciation, interest and other expenses in the context of a complicated sale-and-leaseback arrangement on a bank building. The Court agreed with the findings of the District Court that there was a genuine multiparty transaction with "economic substance" so that the lessor was entitled to the deductions. For our purposes it is significant to note that the Supreme Court laid emphasis on certain fact findings by the District Court concerning the underlying circumstances, stating that "[t]he general characterization of a transaction for tax purposes is a question of law subject to review. The particular facts from which the characterization is to be made are not so

ployees required to run the systems, while the selling companies were not subject to the mini-

mum wage laws. II R. 62–63.

subject." *Id.* at 581 n.16, 98 S.Ct. at 1302 n.16.

Here, the trial court in its instructions to the jury said:

> If you are satisfied by the evidence that Plaintiff did not, at the time of purchase, intend to use the assets involved in its business, and that the assets in fact were never used by Plaintiff after it gained an economic interest in those assets, then you must find for the Defendant because the Plaintiff cannot claim an obsolescence loss on assets that it never used in its business.
>
> On the other hand, if you are satisfied by the evidence that the Plaintiff did, at the time of purchase, intend to use the assets, and did use those assets, then you may find for the Plaintiff.

Instruction No. 7, II R. at 211–12.

■ Whether J.B.N. had the benefits and burdens and intended to use and used the magneto telephone equipment, with the sellers operating the systems as its agents, was a factual question properly left to the jury. The jury's determination, implicit in its verdict, that J.B.N. intended to and did so use the assets, is sufficiently supported by the record. There was evidence that J.B.N. was primarily responsible for ensuring the maintenance of service in the period between execution of the agreements and the conversion of the system to dial operation. J.B.N. would have had to bear the consequences of destruction of the equipment. Under the contracts, J.B.N. was liable for the cost of any capital additions made by the sellers in the event that any manual equipment had to be replaced prior to conversion.

The evidence cannot be held to be all one way and susceptible of no reasonable inferences sustaining the taxpayer's position so as to justify a judgment n. o. v. for the Government on the issue. *Bertot v. School District No. 1, Albany County,* 522 F.2d 1171, 1178 (10th Cir.). Therefore we uphold the inferences implicit in the jury's verdict that J.B.N. intended to use and used the equipment in its business. We hold that J.B.N. had a basis in the equipment and was entitled to a deduction when it ceased to use the equipment and abandoned it.

### III

### *The amount of the deduction*

■ The Government further contends that even if J.B.N. acquired ownership of the equipment at the time of execution of the contracts, too high a portion of the total purchase price of the system was allocated to the equipment. Citing *W E G Dial, supra,* and Reg. § 1.165–3(a)(2), the Government argues that since J.B.N. was aware that the assets would be abandoned upon conversion within two years of the execution of the contracts, their basis should have been the present worth of their rental values for two years. This value is asserted to be less than the $42,014.36 which was allocated by J.B.N. to the equipment.

This argument might have merit. However, it cannot be asserted at this stage of the controversy. There was no issue made at trial of the proper amount of a deduction. When jury instructions were being formulated, the Government insisted that the amount of the deduction was not in issue and objected to an instruction allowing the jury to fix the amount of recovery up to $21,216.52 if they found for the plaintiff. Government counsel stated: "The Plaintiff is either entitled to all of it or none of it . . . . If he is entitled to a deduction, he get [sic] all of it. If he is not entitled to it, he gets none of it . . ." II R. at 188–89. Again, counsel shortly argued that (*id.* at 189):

> It is a tax refund situation and the year in question is 1972 should he be entitled to a deduction. And, if the jury finds it, he would be entitled to the whole amount.

The trial judge followed the Government's theory. The jury was thus instructed to find either for J.B.N. or for the Government, without specifying the amount of the refund, if any, to which J.B.N. was entitled. The jury rendered a verdict for J.B.N., and pursuant to that verdict, the court entered a judgment

awarding J.B.N. the refund in the amount which it claimed.

The Government cannot be heard on appeal for the first time to argue that only a deduction of a smaller amount would be proper in any event. *See Singleton v. Wulff*, 428 U.S. 106, 120, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826; *Neu v. Grant*, 548 F.2d 281, 286–87 (10th Cir.).

## IV

### *The proper year for the deduction*

The Government further argues that if J.B.N. is entitled to a deduction, it should have been taken for 1971 rather than 1972, which was the year for which J.B.N. claimed the deduction. Brief for the Appellant at 20–23. In its motions for a directed verdict and for judgment notwithstanding the verdict, the Government asserted that J.B.N. did not present sufficient evidence that it sustained a loss in 1972. Thus the issue is properly before us.

J.B.N. argues that it was appropriate to claim the deduction in 1972 because it did not have a final inventory of the equipment until that year and, under the Kansas Corporation Commission's accounting order, 1972 was the year in which it could recognize the transaction on its books and begin to amortize the equipment. J.B.N. asserts that the closed and completed transactions entitling it to a deduction were the receiving of the final inventory from an engineering firm, which was not until June 1972, and orders approving the abandonment and accounting from the Kansas Commission in 1973. II R. 80–81; Brief for the Appellee at 15. As noted, an order was issued on January 31, 1973, by the Kansas Commission, authorizing amortization by J.B.N. of the $42,014.36 over a 20-year period beginning in 1972. Pl. Ex. 7, I R. 297–98.

Uncontroverted evidence at trial also established, however, that the manual equipment was actually scrapped in late 1971. I R. 85; II R. 80, 127, 205.[7] The appropriate year for a deduction for the abandonment or obsolesence of an asset is the year in which its useful life ends. Sec. 1.167(a)–8 and –9 Treasury Regulations on Income Tax, 26 CFR § 1.167(a)–8 and –9 (1971); *Tanforan Co. v. United States*, 313 F.Supp. 796, 799–800 (N.D.Cal.), *aff'd per curiam* 462 F.2d 605 (9th Cir.). The year in which the amount of the loss was ascertained is immaterial. Likewise the Commission's treatment of the transaction for regulatory purposes is not controlling for federal tax purposes. *See Old Colony Railroad Co. v. Commissioner*, 284 U.S. 552, 562, 52 S.Ct. 211, 214, 76 L.Ed.2d 484. The deduction must be taken for the year in which the loss was sustained, and all the evidence here indicates that that year was 1971.

Therefore, since the evidence on this issue is all one way and is not susceptible of a reasonable inference which sustains the position of J.B.N., we must rule for the Government on this issue, notwithstanding the verdict. *Bertot v. School District No. 1 of Albany Co., supra*, 522 F.2d at 1175–76. Hence we hold that J.B.N. is not entitled to the deduction for 1972 or the refund on its taxes paid for that year.

## V

### *The availability of relief under the mitigation provisions of the Internal Revenue Code*

J.B.N. argues that if the deduction should have been taken in 1971 rather than 1972, then it is entitled to receive a refund of taxes paid for 1971 in this proceeding, pursuant to §§ 1311 to 1315, the so-called "mitigation provisions" of the Internal Revenue

---

7. In the pretrial order under the plaintiff's factual contentions it was stated that (I R. 85):

In 1971 plaintiff completed its dial conversion program and upon cutting the service over to dial in each exchange caused the old plant which had now become obsolete, with no useful life, to be torn down and permanently retired and abandoned. The tear down costs were reduced by permitting the sellers under agreement to remove for salvage value.

The substance of the foregoing statement of the plaintiff's position was included by the trial court in its charge to the jury. II R. 205.

Code. These sections provide relief from the normally applicable statutes of limitation for both taxpayers and the Government in cases where a deduction is claimed or income is assessed in the wrong year, or a single deduction or a single item of income is allowed or assessed in each of two years.

Section 1311(a) of the Internal Revenue Code, 26 U.S.C.A. § 1311(a), provides as follows:

(a) *General rule.*—If a determination (as defined in section 1313) is described in one or more of the paragraphs of sections 1312 and, on the date of the determination, correction of the effect of the error referred to in the applicable paragraph of section 1312 is prevented by the operation of any law or rule of law, other than this part and other than section 7122 (relating to compromises), then the effect of the error shall be corrected by an adjustment made in the amount and in the manner specified in section 1314.

J.B.N. claims that if 1971 is held to be the proper year for the deduction, there has been a determination described in Section 1312(4), and that it is therefore entitled to relief under Section 1311. For such relief to be obtained it must be established that:

1) there has been a determination as defined in § 1313;

2) this determination is described in § 1312(4);

3) correction of the effect of the error referred to in § 1312(4) is prevented by a rule of law on the date of the determination as required by § 1311(a); and

4) the conditions of § 1311(b)(2)(B) have been met.

We will discuss these requirements in order.

*First,* § 1313(a) defines four types of "determinations." The one pertinent here is "a decision by the Tax Court or a judgment, decree, or other order by any court of competent jurisdiction, which has become final." § 1313(a)(1). Here, once the decision in this case becomes final, it will be such a "determination."

*Second,* § 1312 provides in pertinent part that:

The circumstances under which the adjustment provided in section 1311 is authorized are as follows:

\* \* \* \* \* \*

4) *Double disallowance of a deduction or credit.*—The determination disallows a deduction or credit which should have been allowed to, but was not allowed to, the taxpayer for another taxable year. . . .

Section 1312(4) covers the situation in which a taxpayer claims a deduction which is ultimately disallowed on the ground that it should have been claimed in a different year. *See* Regs. § 1.1312–4. The determination in this case that the deduction should have been taken for 1971 rather than 1972 would be a determination described in § 1312(4).

*Third,* the "error" referred to in § 1312(4) is J.B.N.'s failure to obtain an abandonment deduction for 1971. On the date of the "determination" (*i. e.,* when this decision becomes final), correction of the error would be barred by the statute of limitations, which would preclude taxpayer from making a refund claim for its 1971 taxes. I.R.C. § 6511(a).

The Government's only argument in its appellate brief against the application of the mitigation provisions is that § 1311(a) is not satisfied because, when the IRS determined not to allow the deduction, J.B.N. was not then prevented by limitations from seeking a 1971 refund. As noted, we conclude that the "determination" is the final holding in this proceeding that the deduction was improper for 1971; at that time such a claim for refund for the year 1971 will be untimely, so that the requirement of the mitigation provisions in § 1311(a) is satisfied.

*Fourth,* § 1311(b)(2)(B) provides in pertinent part as follows:

(B) *Determination described in section 1312(4).*—In the case of a determination described in section 1312(4) (relating to disallowance of certain deductions and

credits), adjustment shall be made under this part only if credit or refund of the overpayment attributable to the deduction or credit described in such section which should have been allowed to the taxpayer ... was not barred, by any law or rule of law, at the time the taxpayer first maintained before the Secretary or before the Tax Court, in writing, that he was entitled to such deduction or credit for the taxable year to which the determination relates.

Under § 1.1311(b)–2(b) of the Regulations, "[t]he taxpayer will be considered to have first maintained in writing before the Commissioner ... that he was entitled to such deduction or credit when he first formally asserts his right to such deduction or credit as, for example, in a return...." J.B.N. first claimed its deduction for the "year to which the determination relates," *i. e.*, 1972, when it filed its 1972 tax return. At that time J.B.N. was not barred by the statute of limitations or any other rule of law from asserting its claim for the proper year, 1971. Thus, the requirement of § 1311(b)(2)(B) is met.

The question remains of the proper procedure for obtaining relief under the mitigation provisions and our disposition. Section 1314(b) provides in pertinent part as follows:

(b) *Method of adjustment.*—The adjustment authorized in section 1311(a) shall be made by assessing and collecting, or refunding or crediting, the amount thereof in the same manner as if it were a deficiency determined by the Secretary with respect to the taxpayer as to whom the error was made or an overpayment claimed by such taxpayer, as the case may be, for the taxable year or years with respect to which an amount is ascertained under subsection (a), and as if

on the date of the determination one year remained before the expiration of the periods of limitation upon assessment or filing claim for refund for such taxable year or years....

The Second Circuit has interpreted § 1314(b) to preclude a taxpayer from obtaining relief from a determination in the same proceeding in which the determination itself is made. In its view, after the determination has become final the taxpayer must file a claim for refund with the Internal Revenue Service based on the mitigation provisions, and also must commence a new refund suit if the claim is denied. *Benenson v. United States*, 385 F.2d 26, 31, 33–34 (2d Cir.); *see also* 2 Mertens, *Law of Federal Income Taxation*, § 14.11 at 57. On the other hand, the view has been expressed that "[i]n most cases, as a consequence of the determination, there will be no question as to the propriety or amount of the adjustment, so that the parties may accomplish in one transaction both the settlement of the tax liability for the year with respect to which the determination is made and the adjustment authorized under Section [1311]." Maguire, Surrey, and Traynor, *Section 820 of the Revenue Act of 1938, (part 2)*, 48 Yale L.J. 719, 749.[8]

◼ We agree with the view in the *Benenson* opinion that a claim must be filed with the Commissioner for a refund under the mitigation sections, *see* 385 F.2d at 31, which is also the procedure outlined by § 1.1314(b)–1(a) of the Regulations. 26 CFR § 1.1314(b)–1(a) (1977). J.B.N. contends that its written protest to the proposed deficiency (I R. 37–42) was a sufficient amendment of the claim for refund to make the 1972 claim applicable to 1971. Brief for the Appellee at 13–14. We cannot agree. An argument related to a 1971 claim was not made therein, and no claim

**8.** This article also makes the following comment, 48 Yale L.J. 750 n.131:

In approving the Regulations, Under Secretary Magill stated that 'so far as possible such adjustment would be expedited by settling the tax liability for the open year and the adjustment for the closed year in one proceeding.' Treasury Press Release No. 14–

38, 383 C.C.H. 1938 Fed.Tax Serv. ¶ 6502. There is therefore no foundation for the fear expressed in the Report of the Committee on Federal Taxation, Advance Program of American Bar Association, 61st Annual Meeting (1938) 104, that § 820 'contemplates in every case of inconsistency two separate proceedings.'

was made therein for relief under the mitigation provisions. *See Esterbrook Pen Co. v. United States*, 60–2 U.S.T.C. ¶ 9609 at 77607–08.[9]

We thus conclude that a claim for refund invoking the mitigation provisions must be filed with the Commissioner, unless the 1971 adjustment is made without such a claim. *See* 26 CFR § 1.1314(b)–1(a). This does not mean, however, that this action must be dismissed and an entirely new refund suit commenced, if one is necessary because of denial of mitigation relief by the Commissioner.[10] In light of the remedial purpose of the mitigation provisions, *see Yagoda v. Commissioner*, 331 F.2d 485, 490 (2d Cir.), we feel that the suit may be held in abeyance by the district court; if the refund claim is disposed of without need for a court proceeding, it may be dismissed; if the Commissioner denies relief, further proceedings may be sought in this same action, without the extra effort which a separate refund suit would require.[11]

Accordingly, the judgment is vacated and the cause is remanded to the district court for further proceedings in accord with this opinion.

---

9. We do note that later in this refund suit, J.B.N.'s alternative position relying on the mitigation provisions was asserted in its memorandum opposing the Government's motion for summary judgment, thus giving the Government notice before trial of reliance on those provisions. I R. 171–73.

10. We are mindful that the *Benenson* opinion required not only the filing of a claim for refund invoking the mitigation provisions, but also a separate refund suit, if necessary, after the administrative proceeding. We are not in agreement with the *Benenson* opinion on the latter point and feel an entirely new refund suit unnecessary.

11. Thus there will not be a loss of the determinations made in this refund suit, and discussed in this opinion. Those determinations will be binding on the parties, if further proceedings in this refund suit are required.